AMERICAN BRONZE CORPORATION, PETITIONER *v.*
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

SAUL S. GOLDSTEIN AND DOROTHY GOLDSTEIN, PETITIONERS *v.*
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 9068-73, 9069-73.     Filed September 30, 1975.

*Norman A. Sugarman, James A. Scott,* and *Carmen G. Slominski,* for the petitioners.
*Larry L. Nameroff,* for the respondent.

DRENNEN, *Judge:* In these consolidated cases, respondent determined deficiencies in the Federal income tax of petitioner American Bronze Corp. for the calendar year 1970 and of petitioners Saul S. and Dorothy Goldstein for the calendar year 1968 as follows:

| Docket No. | Petitioner | Year | Deficiency |
|---|---|---|---|
| 9068-73 | American Bronze Corp. | 1970 | $38,865.47 |
| 9069-73 | Saul S. and Dorothy Goldstein | 1968 | 1,074.46 |

An adjustment as to depreciation has been conceded by the petitioner (American Bronze) in docket No. 9068-73. The individual petitioners in docket No. 9069-73 have conceded the adjustment as to the investment credit, and the respondent, after trial, conceded the remaining adjustment therein as to the receipt of proceeds of liquidation. The sole issue, therefore, is whether petitioner American Bronze Corp. engaged in a statutory

merger qualifying under section 368(a)(1)(A), I.R.C. 1954, such that American Bronze, Inc., as the survivor corporation, is entitled under section 381(a) to carryover the amount of $122,083 representing premerger net operating losses incurred by Cleveland Brass Manufacturing Co., the merged corporation.

### FINDINGS OF FACT

Certain facts have been stipulated and are so found.

Saul S. Goldstein (hereinafter Goldstein) and Dorothy Goldstein are husband and wife, whose residence at all times material to these cases was Bratenahl, Ohio. Their joint Federal income tax return for the taxable year 1968 was filed with the Internal Revenue Service Center at Covington, Ky.

Since 1950, Goldstein has owned all the 100 shares of outstanding capital stock of American Bronze Corp. (hereinafter American Bronze or petitioner), an Ohio corporation engaged exclusively in the manufacture and sale of bronze castings for plumbing fixtures. This business is commonly referred to in the trade as "jobbing." At all times material to these cases, American Bronze had its principal office and place of business in Cleveland, Ohio. For the taxable years 1968 and 1969, American Bronze had elected to be taxed under the provisions of section 1371, et seq., I.R.C. 1954; for the taxable year 1970, American Bronze timely terminated said election. Its Federal corporate income tax returns for the taxable years 1968 through 1970, Forms 1120-S and Form 1120, respectively, were filed with the Internal Revenue Service Center at Covington, Ky.

On April 14, 1966, Goldstein purchased 100 percent of the outstanding shares of common stock (490 shares) of Cleveland Brass Manufacturing Co. (hereinafter Cleveland Brass), located in Kinsman, Ohio. Shortly after Goldstein's acquisition of Cleveland Brass, he sold 73.5 shares (15 percent) of its capital stock to Ray Champion, an employee of American Bronze.

Prior to Goldstein's acquisition in 1966, Cleveland Brass was engaged solely in the manufacture and sale of finished cast products known as the Barrett line of valves (which business is generally referred to in the trade as a "product line," as distinguished from "jobbing"). Thereafter, Cleveland Brass not only continued its product line but also entered into the jobbing business, the addition of which entailed the installation of new machinery (financed by a $250,000 Small Business Administra-

tion loan to Cleveland Brass) and the utilization of floor space and facilities previously unused in the Barrett line production. From its inception, the jobbing business conducted by Cleveland Brass consisted largely, although not exclusively, of accommodating those customers whose casting needs exceeded the production capacity of petitioner's foundry. The following schedule, based upon gross invoice prices without reduction for discounts, returns, or allowances, indicates the nature and scope of Cleveland Brass' jobbing business:

SCHEDULE OF SALES TO CERTAIN MAJOR JOBBING
CUSTOMERS OF CLEVELAND BRASS

| Company | 1966 | 1967 | 1968 |
|---|---|---|---|
| Streamway Products, Inc. | $17,702.30 | $79,316.50 | $112,036.66 |
| Buffalo Meter Co. | 68,118.94 | 8,402.22 | 6,903.61 |
| Hunger Brass Co. | - - - | - - - | 10,189.47 |
| Temstat Corp. | 37,602.25 | - - - | - - - |
| Ingersol-Humphrey (Borg Wagner) | - - - | 25,342.64 | - - - |
| Webster Valve | - - - | 100,799.70 | 284,625.35 |
| Total jobbing sales | 123,423.49 | 213,861.06 | 413,755.09 |
| Total sales (Barrett line plus jobbing) | 958,570.49 | 1,223,936.08 | 994,649.91 |

Similarly, as to petitioner American Bronze's jobbing business:

SCHEDULE OF SALES TO CERTAIN MAJOR CUSTOMERS
OF AMERICAN BRONZE

| Company | 1966 | 1967 | 1968 | 1969 | 1970 |
|---|---|---|---|---|---|
| Buffalo Meter Co. | $266,688.19 | $190,289.28 | $225,222.25 | $18,355.45 | - - - |
| Streamway Products, Inc. | 690,357.93 | 688,403.36 | 992,748.82 | 1,397,116.97 | $1,483,234.00 |
| Garvin Corp. | - - - | - - - | - - - | 45,480.76 | 52,478.22 |
| Hunger Brass Co. | - - - | - - - | - - - | 6,010.95 | 2,600.83 |
| American Meter Controls | - - - | - - - | - - - | - - - | 6,553.50 |
| Total | 957,046.12 | 878,692.64 | 1,217,971.07 | 1,466,964.13 | 1,544,866.55 |

On July 31, 1968, Cleveland Brass and Webster Valve Co., Inc. (hereinafter Webster), of Franklin, N.H., entered into a contract for the sale of assets from Cleveland Brass to Webster. By agreement of the parties, the closing date was extended to October 18, 1968. In pertinent part, the contract contains the following provisions:

AGREEMENT made this 31 day of July, 1968, between CLEVELAND BRASS MANUFACTURING COMPANY, an Ohio Corporation with a principal place of business in Kinsman, Ohio ("Seller") and WEBSTER

VALVE COMPANY, INC., a New Hampshire corporation with a principal place of business in Franklin, New Hampshire ("Buyer").

*Section 1. Sale of Assets*

Subject to the terms, conditions and agreements provided in this Agreement, the Buyer agrees to purchase, and the Seller agrees to sell as of the Closing Date (hereinafter defined), all of the assets held by the Seller together with the business of the Seller, as a going concern, including without limitation, its goodwill, franchises, contract rights, trademarks and trade names, and cash, except any funds withheld from employees of the Seller for taxes as of the Closing Date, provided such taxes have not been paid over to the proper taxing authorities by the Seller prior to the Closing or, if only a portion has been paid over, then only an amount equal to the unpaid balance thereof.

*Section 2. Purchase Price*

The purchase price shall be Two Hundred Fifty Thousand Dollars ($250,000), together with the assumption by the Buyer of certain obligations and liabilities of the Seller as provided in Section 4, and subject to the adjustments set forth in Section 7.

*Section 3. Audit*

Touche, Ross, Bailey and Smart, Certified Public Accountants, shall, at the expense of the Buyer, make an audit of the books and records of the Seller as of the close of business on July 31, 1968, and shall furnish the parties, when such audit is completed, with a certified balance sheet of the Seller as of the close of business on said date ("Balance Sheet") and a Statement of Income and Earnings retained in the Business of the Seller for the period ending on such date ("Income Statement"). * * *

    * * *

*Section 4. Assumption of Liabilities by Buyer*

The Buyer shall assume:

.01 All of the liabilities shown as liabilities on the Balance Sheet to be prepared as provided for hereinafter, except liabilities for taxes (other than taxes the value of which have been included in inventory and are shown as accounts payable or accrued taxes on said Balance Sheet) and withheld funds of employees.

.02 Liabilities asserted by customers relating to goods shipped on or after August 1, 1968.

.03 All contracts, commitments, and obligations made or incurred in the ordinary course of business which are specifically referred to or are described in and meet the requirements and conditions set forth in Section 8.12 and Section 12 hereof.

    * * *

*Section 7. Adjustment of Purchase Price*

The purchase price shall be adjusted, if the net assets (which term shall mean the excess of the assets to be transferred to the Buyer less the liabilities to be assumed by the Buyer valued at their book value as shown on the Balance Sheet) is not equal to Two Hundred Twenty-Two Thousand Six Hundred Sixty-Six Dollars ($222,666), by decreasing the purchase price One Dollar ($1.00) for each dollar by which $222,666 exceeds the net assets, or by increasing the purchase price One Dollar ($1.00) for each dollar by which the

net assets exceed the amount of Two Hundred Twenty-Two Thousand Six Hundred Sixty-Six Dollars ($222,666); provided, however, that in the computation of the net assets for the purpose of the adjustment contemplated by this Section 7, the amount of allowance for bad debts provided for in the Balance Sheet shall not be subtracted from gross assets.

*Section 8. Representations and Warranties of Seller*

The Seller represents and warrants that:

\* \* \*

.11 The Seller has delivered to the Buyer an accurate list and summary description of all patents, patent applications, trademarks, trade names and copyrights presently owned or held by the Seller as set forth in Exhibit C attached hereto including, without limitation, rights appurtenant to the "Barrett Line," all of which are valid and in good standing except to the extent of any notations or references made in said summary description.

.12 The Seller has no presently existing contracts or commitments including leases of real or personal property extending beyond July 31, 1968, except as set forth in Exhibit D attached hereto.

\* \* \*

*Section 11. Operation of Business from July 31, 1968 to Closing; Partial Prepayment of Purchase Price*

.01 Beginning on August 1, 1968 and until the Closing Date, the Seller shall use the assets to be purchased to continue to operate the business for the account of the Buyer and in that connection shall establish and maintain separate books of account as soon as practicable and convenient which shall be transferred to the Buyer at the Closing. All profits and losses during this period shall be for the account of the Buyer; all assets received or acquired by the Seller during that period shall be transferred to the Buyer and/or accounted for at the time of closing; and all liabilities incurred by the seller during that period shall be assumed by the Buyer at the Closing Date, provided that the business of the Seller during the period has been conducted in the regular and ordinary course and not in violation of any provision hereof.

\* \* \*

*Section 12. Conduct of Business of the Seller until the Closing Date*

Until the Closing:

.01 The business of the Seller will be conducted only in the ordinary course.

\* \* \*

.05 Except with the consent of the Buyer, no contract or commitment, including leases of real or personal property, will be entered into by or on behalf of the Seller involving an amount in excess of Two Thousand Dollars ($2,000) and no assets; the cost of which is in excess of Sixteen Thousand Dollars ($16,000) for metal, and Two Thousand Dollars ($2,000) otherwise, shall be purchased by the Seller.

.06 The Seller will use its best efforts to preserve its business organization intact, to keep available to the Company the services of its present officers and employees, to preserve for the Company the goodwill of the Seller's suppliers, customers and other business relations with it.

.07 Except with the consent of the Buyer, the Seller shall not extend credit to any one customer in excess of Two Thousand Dollars ($2,000).

.08 The Seller will use its best efforts to maintain existing licenses and franchises in full force and effect, and all reasonable steps shall be taken to renew or extend any such licenses and franchises expiring in accordance with its or their terms.

\* \* \*

*Section 15. Conditions to Seller's Obligations*

The obligations of the Seller under this agreement are subject to fulfillment of the conditions contained in the following paragraphs of this Section 15:

.01 At the Closing, the Buyer shall deliver to the Seller:

(a) A certified bank or cashier's check, made payable to the order of the Seller, in an amount equal to the excess of the adjusted purchase price over Fifty Thousand Dollars ($50,000);

(b) A note, dated as of the Closing Date, in the form shown as Exhibit F attached hereto in the principal amount of Fifty Thousand Dollars ($50,000), payable as provided in said Exhibit;

\* \* \*

## EXHIBIT C

## PATENTS, PATENT APPLICATIONS, TRADEMARKS, TRADE NAMES AND COPYRIGHTS PRESENTLY OWNED OR HELD BY THE SELLER

Trade Names: Barrett Line, Banner Pump

## EXHIBIT D

## CONTRACTS AND COMMITMENT OF SELLER

| | |
|---|---|
| Sales orders for valves | $76,000 |
| Open order jobbing foundry | $50,000 to $75,000 |

In connection with the sale of assets from Cleveland Brass to Webster Valve, the accounting firm of Touche, Ross, Bailey & Smart prepared the following certified balance sheet of Cleveland Brass as of the close of business on July 31, 1968, and a computation of the negotiated sales price: [1]

---

[1] In the cover letter accompanying these statements, Touche, Ross, Bailey & Smart classified the items contained therein as follows:

(1) "Accepted amounts" representing (a) those items the existence and valuation of which are supported by adequate auditable evidence and that (after adjustment) are stated in accordance with generally accepted accounting principles and (b) those items which have been computed by us as described above to represent fair estimates.

(2) "Assets to be appraised" representing those assets that we have found to exist but for which we have found no auditable basis for determining costs.

(3) "Changes to seller's claimed amounts" reflecting all items which in our opinion reflect errors in omission or commission, or differences between the valuation made by the seller and that which, in our opinion, is fair or supportable.

CLEVELAND BRASS MANUFACTURING CO.
NET ASSETS AS CLASSIFIED RE CONTRACT OF SALE
*July 31, 1968*

| Assets | Accepted amounts | Assets to be appraised (note D) | Changes to seller's claimed amounts |
|---|---|---|---|
| Cash | $3,451 | --- | $111 |
| Accounts receivable—trade less allowance for doubtful accounts of $4,000 | 131,453 | --- | 4,550 |
| Inventories (note A): | | | |
| Materials, purchased parts, and castings in foundry | 60,575 | --- | 736 |
| Work in machining department | 70,915 | --- | 22,570 |
| Finished goods | 96,903 | --- | 6,922 |
| Supplies | 8,952 | $8,247 | 5,366 |
| | 237,345 | 8,247 | 35,594 |
| Prepaid insurance | 16,200 | --- | (13,717) |
| Prepaid expenses | 5,901 | --- | 7,677 |
| Property, plant, and equipment—at cost: | | | |
| Land | 1,335 | --- | --- |
| Building | 128,691 | --- | --- |
| Building and machinery improvements | 20,568 | --- | 378 |
| Machinery and equipment | 185,985 | 21,000 | (11,515) |
| Patterns | 15,898 | --- | (637) |
| Office furniture and fixtures | 5,043 | --- | (522) |
| | 357,520 | 21,000 | (12,296) |
| Less accumulated depreciation | 105,532 | 722 | 1,194 |
| | 251,988 | 20,278 | (13,490) |
| Industrial insurance and other deposits | 3,150 | --- | --- |
| Returnable containers and deposits | 106 | --- | 252 |
| Advance to employees | --- | --- | 525 |
| Due from former officers | --- | --- | 5,224 |
| | 649,594 | 28,525 | 26,726 |

*Liabilities*

| | | | |
|---|---|---|---|
| Accounts and notes payable—trade | 229,297 | --- | 562 |
| Accounts payable—other | 2,393 | ---' | (2,393) |
| Amounts withheld from employees' compensation | 23,898 | --- | (4,524) |
| Accrued taxes (note B) | 25,840 | --- | (624) |
| Accrued expenses other than taxes (note C) | 22,518 | --- | (7,614) |
| Dividends payable | 49 | --- | --- |
| Mortgage note | 209,721 | --- | --- |
| Loans payable to bank | 12,172 | --- | (12,172) |
| Note payable—other | 8,500 | --- | --- |
| Total liabilities | 534,388 | --- | (26,765) |
| Net assets | 115,206 | 28,525 | 53,491 |
| | 649,594 | 28,525 | 26,726 |

See notes to statements

### CLEVELAND BRASS MANUFACTURING CO.
### COMPUTATION OF NEGOTIATED SALES PRICE

| | | |
|---|---|---|
| Net assets constituting "accepted amounts" | --- | $115,206 |
| Add amounts agreed to by negotiation: | | |
| Assets to be appraised | --- | 28,525 |
| Amount due from former officer | --- | 5,224 |
| Accounts receivable before audit adjustments and allowance for doubtful accounts | $137,126 | --- |
| Less: Accounts at "accepted amount" of receivables | 131,453 | 5,673 |
| Purchase price, as negotiated | | 154,628 |

CLEVELAND BRASS MANUFACTURING CO.
Notes to Statements
*July 31, 1968*

\* \* \*

D—ASSETS TO BE APPRAISED
    Certain assets were valued at amounts not supported by documentation.
They are as follows:

Supplies:

| | | |
|---|---:|---:|
| Core trays purchased in 1967 _____ | - - - | $1,177 |
| Conversion of core boxes _____ | - - - | 2,800 |
| Tools valued by company_____ | $5,205 | - - - |
| Less: Amount supported by invoices | 935 | 4,270 |

Property:

| | | |
|---|---:|---:|
| Jaws—fixtures for holding products in machines which were made by the Company _____ | - - - | 11,000 |
| Goss Chucking Machine acquired in exchange for an outstanding debt for merchandise sold—recorded value | 10,000 | - - - |
| Less accumulated depreciation __ | 722 | 9,278 |
| | | 28,525 |

The ultimate selling price of the assets which Webster Valve purchased from Cleveland Brass was $153,628. Cleveland Brass retained certain assets associated with its jobbing business[2]

---

[2] The terms of the July 31, 1968, agreement, *supra,* notwithstanding, shortly before trial, petitioner and the Watts Regulator Co., as successors in interest to the parties to said agreement, executed the following document:

ADDENDUM TO AGREEMENT

ADDENDUM made this fourteenth day of November 1974 between AMERICAN BRONZE CORP., and Ohio corporation with a principal place of business in Cleveland, Ohio, and surviving corporation pursuant to a statutory merger with Cleveland Brass Manufacturing Company "Seller" under the corporation laws ·of Ohio, O.R.C. 1701.78-1701.84, and WATTS REGULATOR COMPANY, a Massachusetts corporation with a principal place of business in Lawrence, Massachusetts, and surviving corporation pursuant to a statutory merger with Webster Valve Company, Inc. "Buyer", witnesseth:

WHEREAS, Cleveland Brass and Webster Valve entered into an Agreement dated July 31, 1968, in which it was provided at Section I thereof that Buyer would purchase "all of the assets held by Seller together with the business of the Seller, as a going concern, including its goodwill, franchises, contract rights, trademarks and trade names; and

WHEREAS, the undersigned now desires to clarify said provision in order that the parties may prevent any differences or controversies which might arise in the future with respect to their respective rights and obligations under said Agreement.

NOW, THEREFORE, it is agreed that the following provision be made a part of said Agreement:

Buyer was interested in, and did purchase, only the Barrett Line portion of the business of Seller, as a going concern, including the goodwill of said Barrett Line, franchises, contract rights, trademarks, and trade names of said Barrett Line, the receivables of the business, the physical plant and the foundry located in Kinsman, Ohio.

Buyer was not interested in, nor did it purchase, the jobbing business of Seller, nor the

including matchplates, core boxes, flasks, and customer lists which, along with cash in the amount of $77,628, an account receivable in the amount of $29,000 from Webster, and loans receivable from Goldstein and Ambronze Realty in the amounts of $45,000 and $2,000, respectively, it then transferred to petitioner's plant in Cleveland. Thereafter both Cleveland Brass and petitioner engaged in jobbing operations at the Cleveland foundry; Cleveland Brass' former customers were notified accordingly. In November and December of 1968, petitioner purchased new automatic equipment, a molder, and a core-making machine, respectively, in order to achieve the increased production capacity required as a result of the relocation of Cleveland Brass. Webster conducted no jobbing business at the Kinsman facility.

On November 18, 1968, Cleveland Brass acquired from Ray Champion 73.5 shares of its stock for $9,000. Subsequently, on December 30, 1968, Goldstein transferred 416.5 shares of Cleveland Brass to petitioner. At that time the adjusted cash basis of Goldstein's 416.5 shares of Cleveland Brass was $139,090.47.

Also on December 30, 1968, petitioner and Cleveland Brass executed an "Agreement of Merger" and a "Certificate as to Manner of Adoption of Agreement of Merger." Both documents were filed on December 31, 1968, with the secretary of state,

---

purchase orders, the patterns, the goodwill, or customers of Seller with respect to said jobbing business. "Jobbing business" refers to the selling and manufacturing of castings.

IN WITNESS WHEREOF, the undersigned have duly executed this Addendum and affix their seals on the day and year first above written.

                                    WATTS REGULATOR COMPANY
                                    (successor to)
                                    WEBSTER VALVE COMPANY, INC.
                                    BY    (S) _____

                                        TIMOTHY P. HORNE
                                    AND (S) _____

                                        BURTON WILLIAMS
                                    (SEAL)
                                    AMERICAN BRONZE CORP.
                                    (successor to Cleveland Brass
                                    Manufacturing Company)
                                    BY    (S) _____

                                        SAUL S. GOLDSTEIN
                                    AND _____
                                    (SEAL)

State of Ohio, who thereupon issued a "Receipt and Certificate" evidencing thereby that on December 31, 1968, petitioner and Cleveland Brass effected a statutory merger pursuant to sections 1701.78-1701.84 of the Ohio Revised Code whereby petitioner was the surviving corporation.

On December 31, 1968, a dividend of $65,000 was declared and paid by petitioner to Goldstein in the following manner:

|  | Debit | Credit |
|---|---|---|
| Earned surplus | $1,550.27 | |
| Capital surplus | 63,449.73 | |
| Loan receivable | | $47,000 |
| Draw, Saul Goldstein | | 18,000 |

Similarly, on December 31, 1969, petitioner declared and paid to Goldstein a dividend of $78,178.27 effectuated by the following entries:

|  | Debit | Credit |
|---|---|---|
| Capital surplus | $78,178.27 | |
| Loan receivable | | $9,970.00 |
| Draw, Saul Goldstein | | 68,208.27 |

This procedure did not result in the actual distribution of any significant amount of cash. Except to the extent from current earnings for 1968 ($1,550.27), the distribution constituted a nontaxable return of capital in each of the years 1968 and 1969.[3] Prior to December 31, 1968, petitioner had no history of dividend distributions.

At all times since the merger, petitioner has continued to engage in the jobbing business as indicated in the sales schedule, *supra*. On its Federal income tax return for 1970, petitioner claimed a net operating loss carryover in the amount of $122,083.33, representing combined net operating losses incurred by Cleveland Brass in the years 1965 and 1968 in the amounts of $66,329.86 and $55,753.47, respectively. It is stipulated that if there was a valid merger of American Bronze and Cleveland Brass, petitioner was entitled to utilize the operating losses of Cleveland Brass in those amounts in computing its taxable income for 1970.

In the notice of deficiency issued to American Bronze for 1970 respondent determined that petitioner was "not entitled to carry

---

[3] Of the total distribution ($143,178.27), $141,628 constituted a distribution within the ambit of sec. 301(c)(2).

over the deduction pursuant to section 381(a)(2) of the Internal Revenue Code, because for lack of a business purpose, there was no reorganization pursuant to section 368 of the Internal Revenue Code."

ULTIMATE FINDINGS OF FACT

Cleveland Brass continued in the jobbing business after the sale to Webster Valve.

There was a corporate business purpose for the merger of Cleveland Brass and American Bronze.

OPINION

The sole issue remaining for our determination is whether Cleveland Brass and petitioner engaged in a statutory merger on December 31, 1968, qualifying under section 368(a)(1)(A), I.R.C. 1954,[4] such that pursuant to sections 381(a) and 172,[5] petitioner, as the surviving corporation, is entitled to deduct on its 1970 Federal income tax return the amount of $122,083, representing premerger net operating losses incurred by Cleveland Brass.[6]

---

[4] All references are to the Internal Revenue Code of 1954 as in effect in the taxable years in issue, unless otherwise specified. Sec. 368(a)(1)(A) provides:

(a) REORGANIZATION.—

(1) IN GENERAL.—For purposes of parts I and II and this part, the term "reorganization" means—

(A) a statutory merger or consolidation; * * *

[5] SEC. 381. CARRYOVERS IN CERTAIN CORPORATE ACQUISITIONS.

(a) GENERAL RULE.—In the case of the acquisition of assets of a corporation by another corporation—

* * *

(2) in a transfer to which section 361 * * * applies, but only if the transfer is in connection with a reorganization described in subparagraph (A) * * * of section 368(a)(1),

the acquiring corporation shall succeed to and take into account * * * the items described in subsection (c) of the distributor or transferor corporation * * *

* * *

(c) * * * The items referred to in subsection (a) are:

(1) * * * The net operating loss carryovers determined under section 172 * * *

SEC. 172. NET OPERATING LOSS DEDUCTION.

(a) DEDUCTION ALLOWED.—There shall be allowed as a deduction for the taxable year an amount equal to the aggregate of (1) the net operating loss carryovers to such year, plus (2) the net operating loss carrybacks to such year. * * *

[6] That the validity of the underlying reorganization transaction affords a threshold level of attack in the sec. 381 area is indicated by the language of Rev. Rul. 58-603, 1958-2 C.B. 147, where, in announcing that it would not apply the principle of *Libson Shops, Inc. v. Koehler,* 353 U.S. 382 (1957), to a transaction described in sec. 381(a), the Internal Revenue Service added:

"However, see sections 382(b) and 269 of the 1954 Code for the possible disallowance of net operating loss carryovers in such transactions, and see the Income Tax Regulations

At the outset we note that qualification under State law is a necessary but not sufficient condition to satisfy section 368(a)(1)(A). *Roebling v. Commissioner*, 143 F. 2d 810 (3d Cir. 1944), cert. denied 323 U.S. 773 (1944); *Norman Scott, Inc.*, 48 T.C. 598, 603 (1967). Accordingly, while the precise question, as framed by respondent, focuses on whether there existed a bona fide business purpose, the validity of the merger nevertheless requires an examination of the transaction in the overall context of section 368(a)(1)(A) and the regulations thereunder.[7]

The regulations quoted in the footnote require, for recognition as a reorganization under section 368, that there be a continuity of interest, a continuity of business enterprise, and a business purpose for the transaction. See also *Norman Scott, Inc., supra.*

The continuity-of-interest criterion is clearly met by virtue of Goldstein's ownership of all the stock of both American Bronze and Cleveland Brass before the merger and all of the stock of American Bronze after the merger.

Continuity of business enterprise focuses on the transferee's post-merger business. Nowhere does continuity import a requirement of identity; the continuing business need not be the same as that conducted by the transferor. *Ernest F. Becher*, 22

---

under section 368 of the 1954 Code for the Requirements of a reorganization."

It is conceded that secs. 382 and 269 are inapplicable in the instant case.

[7] Sec. 1.368-1 Purpose and scope of exception of reorganization exchanges.

(b) *Purpose.* * * * The purpose of the reorganization provisions of the Code is to except from the general rule certain specifically described exchanges incident to such readjustments of corporate structures made in one of the particular ways specified in the Code, as are required by business exigencies and which effect only a readjustment of continuing interest in property under modified corporate forms. Requisite to a reorganization under the Code are a continuity of the business enterprise under the modified corporate form, and (except as provided in section 368(a)(1)(D)) a continuity of interest therein on the part of those persons who, directly or indirectly, were the owners of the enterprise prior to the reorganization. * * *

(c) *Scope.* * * * A plan of reorganization must contemplate the bona fide execution of one of the transactions specifically described as a reorganization in section 368(a) and for the bona fide consummation of each of the requisite acts under which nonrecognition of gain is claimed. Such transaction and such acts must be an ordinary and necessary incident of the conduct of the enterprise and must provide for a continuation of the enterprise. A scheme, which involves an abrupt departure from normal reorganization procedure in connection with a transaction on which the imposition of tax is imminent, such as a mere device that puts on the form of a corporate reorganization as a disguise for concealing its real character, and the object and accomplishment of which is the consummation of a preconceived plan having no business or corporate purpose, is not a plan of reorganization.

Sec. 1.368-2. Definition of terms.

(b) The words "statutory merger or consolidation" refer to a merger or consolidation effected pursuant to the corporation laws of the United States or a State or Territory or the District of Columbia.

T.C. 932 (1954), affd. 221 F. 2d 252 (2d Cir. 1955); *Bentsen v. Phinney,* 199 F. Supp. 363 (S.D. Tex. 1961); *United States v. Adkins-Phelps, Inc.,* 400 F. 2d 737 (8th Cir. 1968); Rev. Rul. 63-29, 1963-1 C.B. 77; cf. sec. 382(a)(1)(C) and regulations thereunder. Since after the merger petitioner was actively engaged in the conduct of its jobbing business the requirement of continuity of business enterprise is satisfied.

Having found that the merger transaction conforms with both the continuity of proprietary interest and the continuity of business enterprise requirements [8] we arrive at the precise issue in controversy: Whether there existed the requisite business purpose to qualify the merger as a reorganization under section 368(a)(1). *Gregory v. Helvering,* 293 U.S. 465 (1935); *Lewis v. Commissioner,* 160 F.2d 839 (1st Cir. 1947).

Respondent contends that, under the terms of the July 31, 1968, agreement, Cleveland Brass sold both its Barrett line and jobbing businesses to Webster. Absent a continuing business, respondent accordingly concludes no business purpose could be served by the transaction. Petitioner, on the other hand, argues that there were substantial business purposes to support the merger, to wit: The simplification of business records; the economy of filing only one set of tax returns for each of the several taxing authorities; the elimination of duplicate work and expenses in administrative and accounting in order to expand lines of credit; and further, the jobbing business of each corporation, both owned and operated by the same individual, was the same.

Such reasons have been recognized as indices of business purpose, *Rena B. Farr,* 24 T.C. 350 (1955); *Movielab, Inc. v. United States,* 494 F.2d 693 (Ct.Cl. 1974),[9] and, we think, provide the requisite business purpose for the merger, particularly if Cleveland Brass continued in the jobbing business after the sale to Webster Valve. The evidence and commonsense dictate that the administrative, accounting, and operating expenses of conducting the same business serving essentially the same customers with two separate corporations owned by the

---

[8] In passing to our examination of the third criterion, we note, however, that where continuity of business enterprise is found, business purpose ordinarily presents no problem. *Survaunt v. Commissioner,* 162 F. 2d 753 (8th Cir. 1947); *Lewis v. Commissioner,* 176 F. 2d 646 (1st Cir. 1949).

[9] See also *Elliott J. Roschuni,* T.C.Memo. 1964-321; *Carter Coal Co.,* a Memorandum Opinion of this Court dated Sept. 9, 1951.

same individual would be reduced by merging the two corporations. But this presupposes that both corporations were actively conducting the same business. We therefore were constrained here to determine whether Cleveland Brass continued in the jobbing business after the sale to Webster Valve and until its merger with American Bronze. This is a factual question and our Ultimate Findings of Fact dispose of the issue.[10]

In support of a finding that the sale to Webster encompassed both the Barrett and jobbing enterprises, respondent relies primarily on the terms of the agreement of July 31, 1968, *supra.* Specifically, respondent points to the language of section 1:

> Subject to the terms, conditions and agreements provided in this Agreement, the Buyer agrees to purchase, and the Seller agrees to sell as of the Closing Date (hereinafter defined), *all of the assets held by the Seller together with the business of the Seller, as a going concern, including, without limitation, its goodwill, franchises, contract rights, trademarks and trade names, and cash* * * * [Emphasis added.]

and that of section 8.11:

> The Seller has delivered to the Buyer an accurate list and summary description of all patents, patent applications, trademarks, trade names and copyrights presently owned or held by the Seller as set forth in Exhibit C attached hereto *including,* without limitation, *rights appurtenant to the "Barrett Line,"* * * * [Emphasis added.]

in conjunction with Exhibit D, which lists both jobbing and Barrett Line orders, as evidence that the jobbing business was in fact within the ambit of the sale. Respondent buttresses his conclusion by the fact that the certified balance sheet, *supra,* includes work in process and accounts receivable attributable, in part, to the jobbing aspect. Accordingly, respondent finds that the provisions of sections 11 and 12 with respect to the operation of the business from August 1, 1968, to closing, comport with his characterization of the sale.

We do not accord such import to the failure of these documents generally to distinguish between the Barrett Line and the jobbing enterprise nor feel that the specific provisions cited therein compel the construction advanced by respondent. We note that

---

[10] We do not decide whether the business-purpose test would have been satisfied had Cleveland Brass not continued in business after the sale. The hiatus in business activity, if any, was of very short duration and, absent other factors discussed later in the body of the opinion, would not, in our opinion, disqualify this transaction as a reorganization under sec. 368(a)(1)(A), particularly where the more basic requirements of the regulations, continuity of proprietary interest, and of business enterprise, see *Commonwealth Container Corp.,* 48 T.C. 483, affd. 393 F.2d 269 (3d Cir. 1968), were clearly satisfied.

the equipment used by Cleveland Brass at the Kinsman plant differed significantly from petitioner's equipment (the former were electric furnaces, the latter gas). The equipment at Kinsman was sold to Webster Valve so it could make castings for its own use. Also jobbing operations were such that Cleveland Brass maintained virtually no inventory with respect to its jobbing customers as orders were shipped within 2 to 4 days after completion. The evidence at trial indicated that Cleveland Brass did not intend to move its furnaces and inventories to Cleveland; it proposed to continue its jobbing business for its customers other than Webster Valve at petitioner's plant in Cleveland, using the patterns, matchplates, and core boxes which it did take to Cleveland. While the physical assets Cleveland Brass took to Cleveland, consisting of at least 15 flasks and some 20 patterns used for other customers, had a limited useful life of approximately 8 to 12 months, they each represented an investment by Cleveland Brass of $2,000-$3,500. Accordingly, that Cleveland Brass, as part of the sales transaction, agreed to complete its current orders and assign the correspondent accounts receivable to Webster, reflects the realities of an extant jobbing business in the course of winding down its operations in order to facilitate the impending relocation to petitioner's plant.

Furthermore, in deciding the issue before us, we are more concerned with whether Cleveland Brass actually continued in the jobbing business after the sale than with what assets it sold to Webster. The evidence is uncontroverted that it did continue in the jobbing business. Not only did Goldstein repeatedly testify as to the retention of the jobbing business but also, in response to an inquiry as to what assets, other than cash and receivables, Cleveland Brass had after the sale, specifically asserted:

> All the patterns, all the equipment, everything I took to American Bronze plus all the customers. After all, I had spent three years building up these customers. I had them, they were mine. Those were not turned over. I never would have sold the company if I couldn't have kept my customers and the balance of the patterns and equipment.

thereby indicating that, in his view as president of Cleveland Brass, Cleveland Brass did not part with the jobbing business he had established there in 1966.

This understanding finds explicit corroboration in the Addendum to Agreement, n. 2, *supra,* executed by petitioner and

Watts Regulator Co. (as successor to Webster) on November 14, 1974, wherein the parties agree:

Buyer was interested in, and did purchase, only the Barrett Line portion of the business of Seller, as a going concern, including the goodwill of said Barrett Line, franchises, contract rights, trademarks, and trade names of said Barrett Line, the receivables of the business, the physical plant and the foundry located in Kinsman, Ohio.

Buyer was not interested in, nor did it purchase, the jobbing business of Seller, nor the purchase orders, the patterns, the goodwill, or customers of Seller with respect to said jobbing business. * * *

While we do not accord much weight to the addendum to the extent that it purports to modify ex post facto the terms of the agreement, it nevertheless evinces a mutual intention to exclude the jobbing business from the transaction. Furthermore, the record indicates that Webster Valve did not conduct a jobbing business after the sale.

Moreover, we cannot ignore the additional fact that Cleveland Brass brought outstanding purchase orders to the Cleveland site where they were subsequently filled; customers were notified accordingly. Viewed in the context of the fact that petitioner purchased new molding and core-making machinery in November and December of 1968, respectively, the overall course of action followed by Cleveland Brass after the sale manifests the continued conduct of its jobbing business in contemplation of the merger with petitioner.

In concluding that the facts of the instant case establish the requisite business purpose to the extent such test depends on the postsale viability of the Cleveland Brass jobbing business, we derive support from our prior decisions in *H.F. Ramsey Co.*, 43 T.C. 500 (1965), and *Norman Scott, Inc., supra.* Although *Ramsey* involved the disallowance of the corporate taxpayer's net operating loss carryovers under section 269(a), to the extent that we found the more stringent standard imposed by section 382(a)(1)(C) satisfied, it nevertheless indicates the parameters for the determination of business continuation. There the corporation, which had incurred operating losses since the inception of its road construction business in 1951, began in mid-1956 to curtail its activities such that by December 1957, when its outstanding stock was purchased by individuals engaged in a road construction business associated with that of the taxpayer, the corporation had completed all its contracts, liquidated its

obligations, and sold or otherwise disposed of all its equipment, leaving only a small amount of cash and office furniture. After the change of ownership its operations proved profitable. Notwithstanding this hiatus in business activity, we held that the taxpayer had continued to carry on substantially the same business as that prior to the change in control.

Similarly, in *Norman Scott, Inc., supra,* three commonly owned corporations, each engaged in the same business (the sale and servicing of foreign automobiles), effected a statutory merger pursuant to which the petitioner therein, as the surviving corporation, attempted to carry over the net operating losses of the two transferor corporations. A year prior to the merger, one transferor had sold all of its shop equipment and transferred its inventory to the petitioner's premises. The other transferor also sold its business at one of its two locations and shortly thereafter allowed the lease on this second location to expire so that it, too, by the time of the merger, had moved to the Norman Scott, Inc., site. While the only issue raised therein by the Commissioner was whether the requisite continuity of proprietary interest existed since both transferors were insolvent at the time of the merger, in determining that the merger qualified under section 368(a)(1)(A), we concluded, at page 606:

Here the three corporations controlled by the same stockholders have made a valid merger under State law. *All of the factors required of such a reorganization under section 368 and the regulations promulgated thereunder have either been met, as discussed above, or conceded by respondent.* * * * [Emphasis added.]

Significantly, on facts which might more readily than those of the case before us suggest a termination of the transferors' businesses, the Commissioner found no cause to invoke the business-purpose test as a basis for challenging the merger. Accordingly, business purpose poses no obstacle in petitioner's case.

Having so concluded, we nevertheless deem it appropriate to consider, in the context of the business-purpose requirement, the significance of the fact that the net sale proceeds were effectively distributed by petitioner as dividends to Goldstein. As is well recognized, the business-purpose test is derived from the principles enunciated in *Gregory v. Helvering, supra.* Although the facts of petitioner's case differ materially from those in *Gregory,* particularly in that petitioner was not a newly formed

"shell" but rather a bona fide, preexisting corporation, respondent invokes the conduit analysis to more closely align the instant case with *Gregory;* that is, respondent points to the fact that petitioner, having no prior history of paying dividends, made the substantial distributions and would conclude therefrom that the merger was merely a vehicle enabling Goldstein to receive the sale proceeds without recognizing gain in the form of liquidation proceeds.[11] Articulated more specifically in terms of business purpose, respondent's argument runs as follows: petitioner received from Cleveland Brass liquid assets representing the net sale proceeds in the amount of $141,628 ($153,628 reduced by the $9,000 paid to Ray Champion for his Cleveland Brass stock and the payment of a legal fee); petitioner did not utilize these proceeds in the operation of its business since it effectively distributed the entire amount to Goldstein in the form of dividends declared on December 31, 1968, and December 31, 1969, in the amounts of $65,000 and $78,178.27, respectively; therefore, absent utilization of the Cleveland Brass assets in petitioner's business, no bona fide business purpose existed for the merger.

We disagree, however, with both respondent's initial premise and his conclusion. As a threshold matter, we have found that, in addition to the liquid assets, Cleveland Brass in fact transferred valuable business assets to petitioner which were thereafter integrated into petitioner's operations. Moreover, while we admit that the correlation between the sale proceeds and the amounts distributed to Goldstein affords some basis for close scrutiny, we know of no authority imposing, as a further condition for qualification under section 368(a)(1)(A), the requirement that all transferred assets be utilized in the transferee's business for some specified period of time.[12] The dividend distributions do not, therefore, of themselves vitiate the business purpose for the merger.

The requisites of section 368(a)(1)(A) having been satisfied, petitioner is accordingly entitled under section 381(a) to carryover to the taxable year 1970 the amount of $122,083

---

[11] Respondent concedes, however, that there was no liquidation, formal or de facto, of Cleveland Brass prior to the merger.

[12] Respondent would distinguish the cases relied upon by petitioner as involving no such receipt of assets by the controlling shareholder. This distinction does not, however, suffice to establish respondent's theory.

representing premerger net operating losses incurred by Cleveland Brass.

Because of concessions on other issues,

*Decisions will be entered under Rule 155.*