ATLAS TOOL CO., INC., ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 7633–74—7635–74.  Filed April 27, 1978.

*John J. O'Toole* and *Edwin Fradkin,* for the petitioners.
*Marwin A. Batt,* for the respondent.

---

[1]Cases of the following petitioners are consolidated herewith: Atlas Tool Co., Inc., successor to Fletcher Plastics, Inc., docket No. 7634–74; Stephan Schaffan and Mildred Schaffan, docket No. 7635–74.

SCOTT, *Judge:* Respondent determined deficiencies in petitioners' Federal income taxes in the following amounts:

| Petitioner | Docket No. | TYE | | Deficiency |
|---|---|---|---|---|
| Atlas Tool Co., Inc ...... | 7633–74 | June 30, | 1969 | $147,103.59 |
| | | June 30, | 1970 | 98,933.78 |
| Atlas Tool Co., Inc., successor to | | | | |
| Fletcher Plastics., Inc .. | 7634–74 | Nov. 30, | 1968 | 14,985.42 |
| | | Nov. 30, | 1969 | 22,161.39 |
| | | Nov. 30, | 1970 | 1,238.66 |
| Stephan Schaffan and Mildred Schaffan ....... | 7635–74 | Dec. 31, | 1970 | 232,121.36 |

After concessions by the parties, the following issues remain for our consideration:

(1) Whether a corporate distribution received by petitioner Stephan Schaffan in 1970 was a distribution in complete liquidation of Fletcher Plastics, Inc., treated under section 331, I.R.C. 1954,[2] or a distribution of money in pursuance of a plan of reorganization involving Fletcher Plastics, Inc., and Atlas Tool Co., Inc., treated in whole or in part as a dividend under section 356(a);

(2) In the latter case, whether the amount of a dividend under section 356(a) is measured by the earnings and profits only of Fletcher Plastics, Inc., or by those of Atlas Tool Co., Inc., as well;

(3) Whether Atlas Tool Co., Inc., is liable for the income tax deficiencies of Fletcher Plastics, Inc., at issue in this case; and

(4) Whether Atlas Tool Co., Inc., was formed or availed of for the purpose of avoiding the income tax with respect to its shareholder, Stephan Schaffan, by permitting its earnings and profits to accumulate instead of being distributed, within the meaning of section 532.

### FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

---

[2]All statutory references are to the Internal Revenue Code of 1954, as amended.

Petitioners Stephan Schaffan and Mildred Schaffan filed a joint individual Federal income tax return for calendar year 1970, during which year they were husband and wife. At the time of filing their petition in this case, they each resided in New Jersey. Petitioner Atlas Tool Co., Inc. (hereinafter Atlas), filed corporate Federal income tax returns for its fiscal years ending June 30, 1969, and June 30, 1970. Fletcher Plastics, Inc. (hereinafter Fletcher), filed corporate Federal income tax returns for its fiscal years ending November 30, 1968, November 30, 1969, and November 30, 1970. At the time of filing its petitions in this case, Atlas maintained its principal place of business in Hillside, N. J.

Stephan Schaffan's father organized the Atlas Tool Co. as a sole proprietorship in 1924. The proprietorship manufactured tools, dies, jigs, and fixtures for metal forming, blanking, and stamping and produced certain specialized equipment. Stephan Schaffan began working in the business in 1931. He became a partner in 1945. Beginning in 1945, the partnership became involved in manufacture and sales in the model railroad industry. It simultaneously phased out its manufacture of tools and dies for unrelated parties. After 1949 and to date, the company's efforts have been devoted almost exclusively to the hobby industry, including model railroads and model motoring.

After his father's death in 1948, Stephan Schaffan operated the business as a proprietorship until it was incorporated in 1949 as Atlas Tool Co., Inc. Stephan Schaffan has always been president and principal stockholder of Atlas. During the years in issue, he was the sole stockholder.

Prior to 1960, Atlas conducted design, manufacturing, assembly, and sales functions as an integrated operation. It manufactured principally track, switches, and accessories for model railroads. In 1960, Fletcher was incorporated by Stephan Schaffan, who became its president and sole stockholder. Atlas' plastic injection molding machines were transferred to Fletcher, and Fletcher then performed molding and production of subassemblies for Atlas. Thereafter, Atlas conducted only design, assembly and sales functions. Fletcher made only a few, isolated sales of goods to buyers other than Atlas. Atlas, however, purchased inventory from unrelated domestic and foreign manufacturers for inclusion in its sales line.

Fletcher's operations, its machinery, equipment, employees,

books, and records, were located at 378 Florence Avenue, Hillside, N. J., in a building owned by West Shelton Realty Co., a corporation owned solely by Stephan Schaffan. Fletcher's machinery occupied the first floor of the building. This building also served as the main plant and offices of Atlas, which also leased its space from the realty company.

The operations of Atlas were housed in four buildings during the years in issue. The original building, 413 Florence Avenue, was acquired in 1948 and expanded twice between 1950 and 1952. The 378 Florence Avenue building was constructed in 1951 and expanded in 1959 and 1968. Two other buildings were constructed in 1961 and 1964. Stephan Schaffan owned the 413 Florence Avenue property personally. Aside from 378 and 413 Florence Avenue, the other buildings were owned by Atlas.

A fifth building was constructed by Atlas on land acquired from Stephan Schaffan in 1972. The need for additional space had become apparent about 1969, and the active planning for the building was begun in 1973. Construction was commenced in 1974, and Atlas received a certificate for occupancy on May 28, 1975. The total cost of the building, including mechanical equipment it contained, was $783,934. At least $533,412 of this amount was paid prior to March 15, 1975.

Atlas began purchasing components from foreign sources in 1959. It increased the amount and variety of these imported items throughout the 1960's, purchasing from companies in Germany, Italy, Yugoslavia, Austria, Japan, and Hong Kong. It found that these imports were cheaper than domestically manufactured goods and that their quality was good. Atlas experienced only occasional problems with the quality and shipping arrangements of its imports before 1970. Atlas became increasingly dependent on these imports. During its fiscal years ending June 30 in 1968, 1969, and 1970, imports were approximately 46.6 percent, 45 percent, and 47 percent, respectively, of Atlas' total purchases.

During the years in issue, Atlas normally employed irrevocable letters of credit to pay for its imports. It also used checks and sight drafts for small orders. The letters of credit were obtained through the First National State Bank of New Jersey in the amount of a purchase order and forwarded to the foreign manufacturer. The manufacturer was not required to begin production on the order until receipt of the letter of credit, but

in fact Atlas' regular suppliers usually had already begun production when the letter was issued. The manufacturer was entitled to payment on the order, according to the terms of the letter of credit, upon placing the goods with the carrier. At that point, Atlas' account was charged for the payment and a debit notice was mailed to it. Atlas then received the goods in due course from the carrier, usually within 2 to 3 weeks. Until the manufacturer received payment, the letter of credit represented only a contingent liability. Payment was due only if and when the goods were shipped. However, the letter of credit served as security for the manufacturer while the order was prepared.

Dozens of individual letters of credit were outstanding over the course of any of the years in issue. They could be extended, and many were extended, during those years. During the calendar years 1968, 1969, and 1970, the total amounts of the letters of credit issued on behalf of Atlas were $991,250, $1,497,700, and $385,640, respectively. Fewer letters of credit were issued in 1970 because certain European suppliers were beginning to extend credit to Atlas and were shipping goods without the benefit of letters of credit. The total amount of letters of credit outstanding at any one time during the fiscal years ending June 30, 1968, and June 30, 1969, was between $500,000 and $600,000.

During 1970, 1971, and 1972, Atlas had lines of credit at First National State Bank of Newark in the amounts of $650,000, $650,000, and $240,000, respectively. Atlas had a line of credit with that bank in the other years in issue as well. However, Atlas never borrowed on its line of credit during any of these years. Atlas paid all of its letters of credit and its other payables currently with funds on hand. Purchasers from Atlas usually paid for their purchases within approximately 30 days of shipment.

The assets and liabilities of Atlas for its fiscal years ending in 1964 through 1974, taken from its balance sheets, are summarized on table 1, page 92. Also noted are the dividends it paid during the year and its retained earnings as of the end of each year.

Atlas maintained its cash in checking and savings accounts and in certificates of deposit.

The assets and liabilities of Fletcher for its fiscal years ending in 1962 through 1969, taken from its balance sheets, are summarized on table 2, p. 93. Also noted are the dividends it paid

during the year and its retained earnings as of the end of each year.

On his joint Federal income tax returns for 1968, 1969, and 1970 and on his return for 1971, Stephan Schaffan reported the following adjusted gross income and total income tax liabilities:

| Year | Adjusted gross income | Income tax liability |
|------|----------------------|---------------------|
| 1968 | $152,336 | $81,611 |
| 1969 | 160,826 | 90,107 |
| 1970 | 372,217 | 210,271 |
| 1971 | 184,466 | 109,760 |

After prior consideration, the decision was made in 1969 that the manufacturing operations carried on by Fletcher were no longer essential since the components it produced were available from foreign sources. Pursuant to this decision the following actions were planned and executed:

(1) An appraisal of all of Fletcher's equipment and machinery was obtained from an unrelated appraisal company. The appraisal report, dated June 1, 1970, and forwarded under a cover letter dated August 3, 1970, concluded that the fair market value of the described equipment and machinery was $100,250.

(2) On October 14, 1970, meetings were held of the directors and shareholders of Fletcher Plastics, Inc., which authorized dissolution of the corporation and liquidation and distribution of its assets expressly pursuant to section 337 of the Internal Revenue Code of 1954.[3]

(3) On October 15, 1970, Fletcher's attorneys filed with the District Director of Internal Revenue, Newark, N. J., a Form 966, "Corporate Dissolution or Liquidation," reciting that the liquidation was to be "complete" and performed under section 337.

(4) Also in October of 1970, the corporation applied for a tax clearance certificate from the State of New Jersey in order to commence dissolution.

(5) On November 5, 1970, Fletcher transferred to Atlas all of

---

[3]The minutes of the special meeting of the stockholders recited, in part:

"Such transfer is to be subject to any and all outstanding liens and claims of every kind, nature and description and that said transfer of the assets and property shall be in exchange for the complete cancellation or redemption of all of the issued and outstanding stock of the corporation held by each stockholder which shall be delivered and transferred to the corporation."

TABLE 1.

ATLAS TOOL CO., INC.

| | \_Fiscal years ending June 30—\_ | | | | | | | | | | |
| | 1964 | 1965 | 1966 | 1967 | 1968 | 1969 | 1970 | 1971 | 1972 | 1973 | 1974 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| *Current assets* | | | | | | | | | | | |
| Cash | $408,445.65 | $677,598.16 | $1,037,446.50 | $891,904.60 | $679,119.12 | $1,150,808.70 | $904,437.34 | $1,859,657.44 | $2,987,113.11 | $3,537,460.25 | $3,527,188.44 |
| Notes receivable and accounts receivable | 406,742.54 | 539,414.20 | 354,118.70 | 542,486.90 | 584,314.43 | 678,566.22 | 1,352,607.94 | 1,030,956.01 | 847,024.05 | 1,095,588.09 | 1,424,048.55 |
| Inventory | 402,698.24 | 160,395.20 | 187,950.30 | 165,490.70 | 422,598.80 | 383,495.60 | 254,519.00 | 201,005.00 | 365,474.00 | 594,127.00 | 1,052,664.00 |
| Investments | 170,121.70 | 164,652.91 | 158,961.81 | 153,087.84 | 146,873.03 | 211,812.54 | 192,694.49 | 172,598.26 | 151,473.76 | 129,268.42 | 105,926.91 |
| Subtotal | 1,388,008.18 | 1,542,060.47 | 1,738,476.81 | 1,752,920.04 | 1,882,905.88 | 2,424,678.06 | 2,704,258.77 | 3,264,216.71 | 4,351,084.92 | 5,356,448.76 | 6,109,827.90 |
| *Other assets* | 598,560.51 | 568,613.75 | 667,408.18 | 640,391.42 | 635,827.73 | 530,356.37 | 501,727.76 | 605,637.28 | 565,936.97 | 633,710.97 | 583,578.65 |
| Total assets | 1,986,563.64 | 2,110,674.22 | 2,405,884.99 | 2,393,311.46 | 2,468,733.11 | 2,955,034.43 | 3,205,986.53 | 3,869,853.99 | 4,917,021.89 | 5,990,154.73 | 6,693,406.55 |
| *Current liabilities* | 72,181.17 | 127,565.05 | 196,255.79 | 90,917.46 | 110,999.41 | 228,837.73 | 283,454.01 | 349,477.52 | 405,808.74 | 1,428,305.72 | 1,153,783.01 |
| *Other liabilities* | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total liabilities | 72,181.17 | 127,565.05 | 196,255.79 | 90,917.46 | 110,999.41 | 228,837.73 | 283,454.01 | 349,477.52 | 405,808.74 | 1,428,305.72 | 1,153,783.01 |
| Current ratio (CA/CL) | 19.23 | 12.09 | 8.86 | 19.28 | 16.51 | 10.60 | 11.58 | 9.34 | 10.72 | 3.75 | 5.30 |
| Dividends paid during year | not available | 30,000.00 | 0 | not available | 60,000.00 | 60,000.00 | 60,000.00 | 60,000.00 | 60,000.00 | 70,000.00 | 70,000.00 |
| Retained earnings, end of year | not available | 1,438,109.17 | 1,664,629.20 | 1,757,394.00 | 1,812,733.70 | 2,181,196.70 | 2,427,532.52 | 2,975,376.47 | 3,966,213.15 | 5,016,849.01 | 5,994,623.54 |

TABLE 2.

FLETCHER PLASTICS, INC.

| | 1962 | 1963 | Fiscal years ending Nov. 30— 1964 | 1965 | 1966 | 1967 | 1968 | 1969 | 1970 |
|---|---|---|---|---|---|---|---|---|---|
| *Current assets* | | | | | | | | | |
| Cash | $51,488.70 | $60,752.65 | $109,856.27 | $170,295.74 | $91,972.53 | $164,589.24 | $223,293.69 | $305,454.04 | -- |
| Notes receivable and accounts receivable | 20,727.50 | 85,825.00 | 85,206.25 | 0 | 50,981.50 | 17,101.00 | 26,782.00 | 28,906.50 | -- |
| Inventory | 1,114.40 | 2,947.00 | 3,075.00 | 14,205.00 | 44,065.00 | 23,072.18 | 17,251.00 | 21,260.00 | -- |
| Subtotal | 73,325.60 | 149,524.65 | 198,137.52 | 184,500.74 | 186,969.03 | 204,762.42 | 272,326.69 | 355,620.54 | -- |
| *Other assets* | 128,256.96 | 106,717.10 | 88,379.60 | 78,299.89 | 64,811.63 | 53,089.93 | 55,560.11 | 47,962.84 | -- |
| Total assets | 201,582.56 | 256,241.75 | 286,517.12 | 262,800.63 | 251,780.66 | 257,852.35 | 327,886.80 | 403,583.38 | -- |
| *Current liabilities* | 67,846.79 | 60,862.58 | 42,474.59 | 20,406.27 | 6,645.28 | 5,714.94 | 25,183.54 | 27,618.31 | -- |
| *Other liabilities* | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | -- |
| Total liabilities | 67,846.79 | 60,862.58 | 42,474.59 | 20,406.27 | 6,645.28 | 5,714.94 | 25,183.54 | 27,618.31 | -- |
| Current ratio (CA/CL) | 1.08 | 2.46 | 4.66 | 9.04 | 28.14 | 35.84 | 10.81 | 12.88 | -- |
| Dividends paid during year | not available | 0 | 0 | 30,000.00 (cash) 100,000.00 (stock) | 0 | 0 | 0 | 0 | -- |
| Retained earnings, end of year | not available | not available | 234,042.53 | 132,394.36 | 185,135.38 | 142,187.41 | 192,708.26 | 265,965.07 | 371,880.07 |

its equipment and machinery, as described in the appraisal report, and received a check from Atlas for $100,250. Fletcher also transferred its inventory to Atlas for $14,600, its cost to Fletcher. The only accounts receivable by Fletcher at the time were from Atlas, which paid them in full.

(6) On November 19, 1970, Stephan Schaffan received a cash distribution from Fletcher which represented all of its remaining assets.

(7) Final tax returns were filed with both State and Federal authorities.

(8) On June 11, 1971, a certificate of dissolution was filed for Fletcher by Stephan Schaffan with the New Jersey secretary of state.

No written plan of liquidation existed other than the documents evidencing these actions.

After these actions the machinery and equipment transferred to Atlas remained in place at 378 Florence Avenue. It was idle from approximately November 5, 1970, until the end of February 1971. Fletcher's employees remained in the employ of Atlas, which used them initially in its packing and shipping departments. It was Atlas' policy not to fire personnel other than for cause, since its attrition rate was high.

Atlas' sales were seasonal. The heaviest sales volume occurred from September through February with a high concentration of sales before Christmas. To meet this seasonal demand, Atlas stockpiled its inventory during the periods preceding highest demand. Fletcher's manufacturing equipment was operated continuously throughout the year, although its operations were slower in December and January. Normally, after Atlas was sufficiently supplied for the current sales season, Fletcher's operations contributed to stockpiles for the following year.

In 1970, in anticipation of terminating Fletcher's manufacturing activities, additional orders were placed by Atlas with foreign suppliers for items previously supplied by Fletcher. Stockpiles of these items were deemed sufficient to last through the peak sales season.

In December of 1970, problems with the quality of foreign supplies began appearing. Initially, Atlas received a shipment of railroad track that was twisted, and Mr. Schaffan flew to Europe in December or the following January to help remedy the problem. He was not successful, and defective track

continued to be shipped. Furthermore, other defective material was received in the 3 or 4 months following November 5, 1970, and delays in shipments occurred. Some of the defective material was returned, and some was repaired by Atlas.

About the end of February 1971, Atlas became worried about maintaining its inventory through the next season. At that time it began manufacturing components for its product line with 2 or 3 of the 29 injection molding machines acquired from Fletcher on November 5, 1970. During 1971, Atlas continued to experience inadequate deliveries and quality from the foreign suppliers, and additional machines were placed in service. By the fall of 1971, all of the manufacturing equipment and machinery acquired from Fletcher had been placed in operation. At the time of the hearing in this case, Atlas was still manufacturing components for its product lines. Some of the machines acquired from Fletcher were still in use, and new machines had been purchased and updated.

On their income tax return for 1970, Stephan and Mildred Schaffan reported a capital gain of $390,000 on the cash distribution to Stephan Schaffan from Fletcher. They reported a gross sales price of $400,000 and an adjusted basis of $10,000. In his notice of deficiency to these petitioners, respondent made the following determination:

> The alleged sale of the operating assets of Fletcher Plastics, Inc. to Atlas Tool Co., both commonly owned by Stephan Schaffan, and a distribution of assets of Fletcher Plastics, Inc. to Stephan Schaffan, constituted a reorganization under Code Section 368(a)(1)(D) and a dividend distribution under Code Section 356(a). Further no "complete liquidation" of Fletcher Plastics, Inc. occurred here and hence Section 337 of the Code does not apply. Accordingly, the distribution of $482,246.86 is taxable as an ordinary dividend.

Petitioner Atlas Tool Co., Inc., has petitioned from two notices mailed to it by respondent. In the first, addressed to Atlas Tool Co., Inc., respondent "determined that earnings and profits [had] been accumulated beyond the reasonable needs of the business" and imposed an accumulated earnings tax for Atlas' fiscal years ending June 30, 1969, and June 30, 1970, in the amounts of $131,762.47 and $87,477.54, respectively. The second notice was addressed to "Atlas Tool Co., Inc., Successor to Fletcher Plastics, Inc." and was labeled a "Notice of Deficiency." This notice made the following determination:

> It has been determined that Atlas Tool Co., Inc. is the successor to Fletcher

Plastics, Inc. because Atlas Tool Co. acquired the business of Fletcher Plastics, Inc. within the ambit of section 368(a)(1)(D) of the Internal Revenue Code.

It has been determined that the earnings and profits of Fletcher Plastics, Inc. have accumulated beyond the reasonable needs of the business in each of the taxable years ended November 30, 1968 and November 30, 1969. Therefore, the tax provided by section 531 of the Internal Revenue Code has been imposed in each taxable year. * * *

The amounts of accumulated earnings tax imposed were $13,728.82 and $20,147, respectively.

In prior action by this Court, we held that a valid, timely petition had been filed on behalf of Atlas in docket No. 7634–74, although the original petition had been captioned "Fletcher Plastics, Inc., Stephan Schaffan, Transferee," and we allowed Atlas to amend its pleadings to conform with the notice it received. *Fletcher Plastics, Inc., Stephan Schaffan, Transferee v. Commissioner*, 64 T.C. 35 (1975). Subsequently, petitioner filed a motion to dismiss or in the alternative to require respondent to plead transferee liability. By order dated January 21, 1977, we denied the motion to dismiss, but allowed respondent to file an amended answer making proper allegation of transferee liability.

## OPINION

### Issue 1. Distribution to Stephan Schaffan

Stephan Schaffan owned all of the stock of two corporations, Atlas and Fletcher. In 1970, Fletcher transferred all of its operating assets and inventory to Atlas and received cash in return. Fletcher then distributed to Schaffan all of its remaining assets, consisting only of cash. Subsequently in 1971, Fletcher was dissolved under State law. Petitioners assert that these transactions should be characterized according to the forms they took, a sale by Fletcher to Atlas on which gain is not recognized under section 337, and a distribution in complete liquidation of Fletcher that was entitled to treatment as full payment in exchange of Stephan Schaffan's stock under section 331. Respondent, on the other hand, has determined that no complete liquidation of Fletcher occurred, that the transactions in fact

constitute a reorganization of Fletcher and Atlas described in section 368(a)(1)(D),[4] and that the distribution was wholly a taxable dividend to Stephan Schaffan under section 356(a).

Fact patterns similar to that of the instant case have been the subject of frequent litigation. It is well established that in a proper case a transaction styled as a corporate sale of assets and liquidation may be recharacterized for Federal tax purposes as a reorganization and may lead to quite different tax results. See, e.g., *DeGroff v. Commissioner*, 54 T.C. 59 (1970), affd. per curiam 444 F.2d 1385 (10th Cir. 1971); *Wilson v. Commissioner*, 46 T.C. 334 (1966).

The facts of this case fall within the statutory definition of a reorganization described in section 368(a)(1)(D).[5] There was a transfer by Fletcher of a part of its assets to Atlas, and immediately after the transfer, the shareholder of the transferor was in control of the corporation to which the assets were transferred. Although no stock or securities were actually distributed by Atlas as a part of the transaction, we have repeatedly held that, when the stock ownership of transferor and transferee is identical, the actual distribution would be a mere formality and the statute may be satisfied without it. See *American Manufacturing Co. v. Commissioner*, 55 T.C. 204, 221 (1970); *James Armour, Inc. v. Commissioner*, 43 T.C. 295, 307 (1964).

Furthermore, the distribution, had it been made, would have qualified under section 354.[6] The transferee corporation must

---

[4] By amendment to his answers in docket Nos. 7634–74 and 7635–74, respondent raised for the first time an allegation that the steps in which Fletcher and Atlas engaged also constituted a reorganization described in sec. 368(a)(1)(F). Respondent expressly abandoned this position on brief, relying on his allegation of a "D" reorganization.

[5] SEC. 368(a). REORGANIZATION.—

(1) IN GENERAL.—For purposes of parts I and II and this part, the term "reorganization" means—

\*          \*          \*          \*          \*          \*          \*

(D) a transfer by a corporation of all or a part of its assets to another corporation if immediately after the transfer the transferor, or one or more of its shareholders (including persons who were shareholders immediately before the transfer), or any combination thereof, is in control of the corporation to which the assets are transferred; but only if, in pursuance of the plan, stock or securities of the corporation to which the assets are transferred are distributed in a transaction which qualifies under section 354, 355, or 356;

[6] SEC. 354. EXCHANGES OF STOCK AND SECURITIES IN CERTAIN REORGANIZATIONS.

(a) GENERAL RULE.—

(1) IN GENERAL.—No gain or loss shall be recognized if stock or securities in a corporation a party to a reorganization are, in pursuance of the plan of reorganization, exchanged solely for stock or securities in such corporation or in another corporation a party to the reorganization.

acquire "substantially all of the assets of the transferor" under section 354(b)(1)(A), but it is sufficient for this requirement that all assets necessary or appropriate to the conduct of the transferor's business be transferred. *Wilson v. Commissioner, supra* at 345; *Moffat v. Commissioner*, 42 T.C. 558, 578 (1964). Here, all assets of Fletcher other than cash were transferred to Atlas, and this falls well within the statute. See *Wilson v. Commissioner, supra* at 346. All assets remaining in Fletcher after the transfer were distributed to its shareholder, satisfying section 354(b)(1)(B). Finally, these steps were taken pursuant to a plan of reorganization. Each step taken in connection with Fletcher's transfer of assets to Atlas and its distribution of residual assets to Stephan Schaffan were part of an overall plan by the management and stockholders of Atlas and Fletcher to achieve an end result that we find to be the reorganization of the two corporations. The labels attached to the transaction by petitioners do not alter the nature of the plan, and no formal written document is necessary. See *Wilson v. Commissioner, supra* at 345; *Lesser v. Commissioner*, 26 T.C. 306, 311–312 (1956).

In spite of the satisfaction of the statutory requirements, petitioners have asserted two grounds for finding on these facts that no reorganization occurred. First, they contend that there was no tax avoidance motive for the steps taken by Fletcher and, therefore, that the form in which the steps were cast should control their tax effects. Second, petitioners contend "that there was no continuation of Fletcher's business enterprise in Atlas," which continuation they deem necessary for treatment as a reorganization.

Contrary to petitioners' first contention, there is no requirement that tax avoidance be found to be the motive of a transaction styled as a liquidation before that transaction can be properly recharacterized as a reorganization. Although tax

---

\*     \*     \*     \*     \*     \*     \*

(b) EXCEPTION.—

(1) IN GENERAL.—Subsection (a) shall not apply to an exchange in pursuance of a plan of reorganization within the meaning of section 368(a)(1)(D), unless—

(A) the corporation to which the assets are transferred acquires substantially all of the assets of the transferor of such assets; and

(B) the stock, securities, and other properties received by such transferor, as well as the other properties of such transferor, are distributed in pursuance of the plan of reorganization.

avoidance is often the motivation where steps are taken and labels are assigned which deny the true nature of a transaction, treatment of a transaction as a reorganization, in accordance with the substance of the transaction, does not depend upon such a motive. See *American Manufacturing Co. v. Commissioner, supra; Wilson v. Commissioner, supra; Lesser v. Commissioner, supra;* cf. *Lewis v. Commissioner,* 10 T.C. 1080, 1086–1088 (1948), affd. 176 F.2d 646 (1st Cir. 1949).[7] Here, all the steps relating to the transfer of Fletcher's operating assets to Atlas and the distribution of cash to Stephan Schaffan were taken as preconceived steps in a single plan of action. The intended and actual result of the plan was the realignment of assets among the two corporations and their stockholder. The tax effects of the realignment must be determined by viewing the transactions together rather than as unrelated steps, regardless of petitioners' motives. See *James Armour, Inc. v. Commissioner, supra* at 305. Therefore, the form in which any single step was cast cannot determine the tax consequences of the complete transaction.

Furthermore, in our view, petitioners' denial of any tax avoidance motives cannot be fully accepted as fact. It is true that the decisions to interrupt Fletcher's activities indefinitely, to rely on imported goods, and to retain Fletcher's operating assets were made for reasons solely related to the businesses conducted by the two corporations. The steps taken to carry out these decisions were not dictated by these businesses, however, but by the personal concerns of Stephan Schaffan. It is our view that, having decided that his corporations would take certain actions for business reasons, Stephan Schaffan attempted to seize on the opportunity to extract cash from his corporations at favorable tax rates by carefully selecting the form of the transaction. We do not suggest that it is improper for a taxpayer to seek to reduce or avoid taxes in this manner, short of evasion. However, when the net result of the steps so taken is that of a reorganization described in section 368, a taxpayer cannot avoid the reorganization provisions simply by labeling his steps otherwise.

Petitioners' second contention relates to the nonstatutory

---

[7]See also *Estate of Bell v. Commissioner,* T.C. Memo. 1971–285. But see *Pridemark, Inc. v. Commissioner,* 345 F.2d 35, 41 (4th Cir. 1965), affg. in part and revg. in part 42 T.C. 510 (1964).

requirements of reorganizations. Mere mechanical satisfaction of the statutory reorganization provisions alone will not result in reorganization treatment. Section 1.368–1, Income Tax Regs., provides in part:

> The purpose of the reorganization provisions of the Code is to except from the general rule certain specifically described exchanges incident to such readjustments of corporate structures made in one of the particular ways specified in the Code, as are required by business exigencies and which effect only a readjustment of continuing interest in property under modified corporate forms. Requisite to a reorganization under the Code are a continuity of the business enterprise under the modified corporate form, and (except as provided in section 368(a)(1)(D) ) a continuity of interest therein on the part of those persons who, directly or indirectly, were the owners of the enterprise prior to the reorganization. * * * [Sec. 1.368–1(b), Income Tax Regs.]

> A plan of reorganization must contemplate the bona fide execution of one of the transactions specifically described as a reorganization in section 368(a) and for the bona fide consummation of each of the requisite acts under which nonrecognition of gain is claimed. Such transaction and such acts must be an ordinary and necessary incident of the conduct of the enterprise and must provide for a continuation of the enterprise. A scheme, which involves an abrupt departure from normal reorganization procedure in connection with a transaction on which the imposition of tax is imminent, such as a mere device that puts on the form of a corporate reorganization as a disquise for concealing its real character, and the object and accomplishment of which is the consummation of a preconceived plan having no business or corporate purpose, is not a plan of reorganization. [Sec. 1.368–1(c), Income Tax Regs.]

> Moreover, the transaction, or series of transactions, embraced in a plan of reorganization must not only come within the specific language of section 368(a), but the readjustments involved in the exchanges or distributions effected in the consummation thereof must be undertaken for reasons germane to the continuance of the business of a corporation a party to the reorganization. Section 368(a) contemplates genuine corporate reorganizations which are designed to effect a readjustment of continuing interests under modified corporate forms. [Sec. 1.368–2(g), Income Tax Regs.]

The nonstatutory requirements are usually formulated as (1) continuity of the proprietary interest held by the shareholders of the transferor corporation, (2) continuity of the business enterprise, and (3) a business purpose for the reorganization. *Norman Scott, Inc. v. Commissioner*, 48 T.C. 598, 603 (1967). See also *American Bronze Corp. v. Commissioner*, 64 T.C. 1111, 1123 (1975).[8]

---

[8]As Stephan Schaffan was the sole shareholder of Fletcher and Atlas, there is clear continuity of proprietary interest. See *American Bronze Corp. v. Commissioner*, 64 T.C. 1111, 1123 (1975).

Petitioners have framed their argument more narrowly than these formulations. The thrust of their argument is that a continuation of Fletcher's specific business activities by Atlas must occur for there to be a reorganization and that this continuation must be intended and uninterrupted. Petitioners assert that none of these conditions were satisfied in this case.

In our view, neither the business purpose requirement nor the continuity of business enterprise requirement encompasses petitioners' asserted test. Although the business purpose of a reorganization may be more readily discerned if the transferor's business is continued,[9] petitioners themselves have asserted that there were substantial business purposes for the dissolution of Fletcher and transfer of its assets to Atlas and that there were no tax avoidance motives for these actions. Continuation of the transferor's business certainly is not a prerequisite to every imaginable business purpose for a reorganization. The purpose of petitioners to retain the assets in corporate solution to ensure a ready source of supply is a valid business purpose, especially where substantial risks are apparent.

The Court has also held that the requirement of continuity of business enterprise in the context of reorganization qualification[10] does not require continuation of the transferor's business activity. In *American Bronze Corp. v. Commissioner*, *supra* at 1123–1124, we held that:

> Continuity of business enterprise focuses on the transferee's post-merger business. Nowhere does continuity import a requirement of identity; the continuing business need not be the same as that conducted by the transferor. *Ernest F. Becher*, 22 T.C. 932 (1954), affd. 221 F.2d 252 (2d Cir. 1955); *Bentsen v. Phinney*, 199 F. Supp. 363 (S.D. Tex. 1961); *United States v. Adkins-Phelps, Inc.*, 400 F.2d 737 (8th Cir. 1968); Rev. Rul. 63–29, 1963–1 C.B. 77; cf. sec. 382(a)(1)(C) and regulations thereunder. Since after the merger petitioner [the transferee corporation] was actively engaged in the conduct of its jobbing business the requirement of continuity of business enterprise is satisfied.

See also *Pebble Springs Distilling Co. v. Commissioner*, 23 T.C. 196 (1954), affd. 231 F.2d 288 (7th Cir. 1956), cert. denied 352

---

[9]Cf. *Wortham Machinery Co. v. United States*, 521 F.2d 160 (10th Cir. 1975); *American Bronze Corp. v. Commissioner, supra* at 1124 and nn. 8, 10.

[10]Continuity of business enterprise in this context is to be distinguished from a different doctrine of the same name employed in *Libson Shops, Inc. v. Koehler*, 353 U.S. 382 (1957), concerning loss carryovers. See generally *Coast Quality Construction Corp. v. United States*, 463 F.2d 503, 510 (5th Cir. 1972).

U.S. 836 (1956); *Morley Cypress Trust, Schedule "B" v. Commissioner*, 3 T.C. 84 (1944).

Several "D" reorganization cases have dealt substantively with continuity of the transferor corporation's business and assets. Some cases have approached the problem in the context of termination of the transferor's business and transfer of its assets to a newly formed, related corporation for the sole purpose of disposal of those assets to unrelated parties. These cases have consistently held that no reorganization occurred because no business of any kind was conducted by the transferee corporation after the transfer. *Standard Realization Co. v. Commissioner*, 10 T.C. 708 (1948); *Graham v. Commissioner*, 37 B.T.A. 623 (1938). Also, in *Mitchell v. United States*, 451 F.2d 1395 (Ct. Cl. 1971), there was no reorganization when, in furtherance of liquidation, corporate assets were sold for cash to a preexisting sister corporation where the parties intended for the sister corporation to sell the assets and not retain them for its own use. All salable assets were sold within a short period of time, although the sister corporation made some incidental use of a small amount of the transferor's equipment in its own business before disposal.[11]

However, if the transferee corporation receives the transferor's assets with the understanding that it will operate any part of the transferor's business indefinitely and it does so, then *Standard Realization Co., Graham,* and *Mitchell* may be distinguished. Thus, in *Lewis v. Commissioner*, 176 F.2d 646 (1st Cir. 1949), affg. 10 T.C. 1080 (1948), there was a reorganization even though the transferor corporation had attempted to sell all three of its lines of business, had sold two, and had transferred only one line to the transferee for operation until a fair price could be obtained.[12] See also *American Bronze Corp. v. Commissioner, supra.*

It is well established that the same business need not be conducted by the transferee as was conducted by the transferor. In several cases in which reorganizations were found, the transferor's assets have been taken by a newly formed, related

---

[11]*Mitchell v. United States,* 451 F.2d 1395 (Ct. Cl. 1971), also predicated its ultimate conclusion, that there was a complete liquidation to which sec. 331 applied, on the finding that there was no continuation of the transferor's business after the transfer of its assets. It expressly did not reach the question of whether the transaction met the requirements for a reorganization.

[12]The assets of this third business were sold less than 3 years later.

corporation and employed in a different business. In *Pebble Springs Distilling Co. v. Commissioner, supra,* the shareholders of the transferor placed its distillery assets at auction, but formed a new corporation to make a minimum bid to prevent a sale below fair value. The new corporation, after making the high bid for the assets, rented storage space in part of the distillery facilities but did not engage in distilling. Nevertheless, this conduct of a different business by the transferee was sufficient to satisfy the reorganization provisions. See also *Morley Cypress Trust, Schedule "B" v. Commissioner, supra; Bentsen v. Phinney,* 199 F. Supp. 363 (S.D. Tex. 1961).

In these last cases the principal assets transferred were themselves employed in the changed business conducted by the transferee corporation. But in *Becher v. Commissioner,* 22 T.C. 932 (1954), affd. 221 F.2d 252 (2d Cir. 1955), the assets transferred were primarily cash and assets expected to be turned into cash. Nevertheless, we held in that case that there was a reorganization, even though the transferor's business had been terminated prior to the transfer, no going business was transferred and the assets transferred were of the type described. We explained in *Becher v. Commissioner, supra* at 941:

> The important factor is that [the transferee] was created to carry on corporate business indefinitely, although with a different line of manufacture from that conducted by its predecessor. Cf. *Lewis v. Commissioner,* (C. A. 1) 176 F. 2d 646. In the instant case the reorganization was effected for a sound "business purpose." Corporate business was to be continued indefinitely, and the same shareholders remained in "control" and their investment remained "in solution." Therefore, there was compliance with both the letter and spirit of section 112(g).

Here, as in *Becher,* there was a sound business purpose for the reorganization, a corporate business was conducted indefinitely by the transferee, and the same stockholder remained in control with his investment still in corporate solution. Aside from the receipt of boot by Stephan Schaffan, no change in the incidents of taxation should occur upon the realignment of Fletcher's operating assets within the corporate group. Other than that distribution, there was "no change of substance in the rights and relations of the interested parties one to another or to the corporate assets." *Bazley v. Commissioner,* 331 U.S. 737 (1947).

The risks and benefits of ownership of Fletcher's operating

assets remained within a corporate vehicle controlled by Stephan Schaffan. They were retained for an indefinite period for possible use by the surviving corporate entity in its business in the event the planned alteration of the overall corporate operation was not satisfactory. The facts that Fletcher's business activity was halted indefinitely and that the assets transferred were inactive when received are no more significant here than was the fact that the principal assets transferred in *Becher* were cash or assets expected to be converted to cash. In both cases, the particular assets were transferred for reasons germane to the business actively conducted by the transferee corporation. The assets in this case were "used" by Atlas even while inactive, in the sense that they performed the function of reducing the risks of the business. In this sense they performed a function as integrally related to Atlas' business as standby generating capacity performs for electric utilities.

We find that there is no general reorganization requirement, such as that asserted by petitioners, requiring a continuation by the transferee of the business activities of the transferor corporation. We find further that the facts of the instant case satisfy all existing nonstatutory reorganization requirements as evidenced in the cases discussed.

Our research has found statements in a few cases that would seem to reach a conclusion different from ours. However, we are not persuaded that these cases establish a test of reorganization similar to that proposed by petitioners. The bulk of these cases deal with asserted reorganizations described in section 368(a)(1)(F). See *Home Construction Corp. v. United States*, 439 F.2d 1165, 1168 (5th Cir. 1971); *Pridemark, Inc. v. Commissioner*, 345 F.2d 35, 42 (4th Cir. 1965), affg. in part and revg. in part 42 T.C. 510 (1964); *Book Production Industries, Inc. v. Commissioner*, T.C. Memo. 1965–65. We attribute the statements made in these cases regarding continuation of the transferor's business to the limitation of those cases to "F" reorganizations, to the peculiar definition of an "F" reorganization, and to the factual context in which most "F" reorganizations occur. We do not view these cases as endorsing a general rule for application in all reorganizations.

In two cases courts have appeared to take positions opposed to ours in contexts other than "F" reorganizations. *Mitchell v. United States, supra,* has already been noted. In *Wortham*

*Machinery Co. v. United States,* 521 F.2d 160 (10th Cir. 1975), affg. 375 F. Supp. 835 (D. Wyo. 1974), one of two commonly controlled corporations acquired the assets of the other in a purported "C" reorganization. However, the transferor had terminated its business several months before the transfer, and its assets were of no use to the transferee. The lower court had limited its opinion to a finding that there was no business purpose for the reorganization. *Wortham Machinery Co. v. United States,* 375 F. Supp. at 838–839. The precise holding was sustained because it was supported by substantial evidence, but the court went on to note that there was no "continuity of business enterprise," apparently because the transferor's assets were not employed in a business conducted by the transferee. See *Wortham Machinery Co. v. United States,* 521 F.2d at 163. No explanation or support was provided for the statements in either *Wortham Machinery Co. v. United States, supra,* or *Mitchell v. United States, supra.* Each case reaches the proper result on grounds other than continuity of business. In light of our prior analysis, we do not view these unnecessary statements as authority for concluding that there must be a continuation by the acquiring corporation of the same business enterprise conducted by the transferor in order for the provisions of section 368(a)(1)(D) to be applicable.

Having found petitioners' arguments unpersuasive, we find that in this case all the statutory and nonstatutory requirements of a reorganization described in section 368(a)(1)(D) are satisfied as determined by respondent. This finding precludes the application of section 331 to Stephan and Mildred Schaffan. See *Ringwalt v. United States,* 549 F.2d 89, 91 (8th Cir. 1977); *James Armour, Inc. v. Commissioner, supra* at 310.[13] The distribution received by Stephan Schaffan in 1970 must be treated under section 356.

*Issue 2. Treatment of Distribution to Stephan Schaffan*

Respondent determined that Stephan Schaffan received a distribution from Fletcher of $482,246.86, and petitioners have

---

[13]Because we have found that the facts presented constitute a reorganization within the meaning of sec. 368 and this forecloses application of sec. 331, we do not reach the issue raised by respondent, but not argued, that any liquidation that occurred was not a "complete" liquidation within the meaning of sec. 331. See generally *Telephone Answering Service v. Commissioner,* 63 T.C. 423 (1974), affd. 546 F.2d 423 (4th Cir. 1976), cert. denied 431 U.S. 914 (1977).

neither presented evidence nor argued that the amount admittedly received was less than this amount.[14] As our previous discussion shows, this was received in connection with steps taken pursuant to a plan of reorganization described in sections 368(a)(1)(D) and 354 and was integrally related thereto. Section 356(a) provides:

SEC. 356. RECEIPT OF ADDITIONAL CONSIDERATION.

(a) GAIN ON EXCHANGES.—

    (1) RECOGNITION OF GAIN.—If—

        (A) section 354 or 355 would apply to an exchange but for the fact that

        (B) the property received in the exchange consists not only of property permitted by section 354 or 355 to be received without the recognition of gain but also of other property or money,

then the gain, if any, to the recipient shall be recognized, but in an amount not in excess of the sum of such money and the fair market value of such other property.

    (2) TREATMENT AS DIVIDEND.—If an exchange is described in paragraph (1) but has the effect of the distribution of a dividend, then there shall be treated as a dividend to each distributee such an amount of the gain recognized under paragraph (1) as is not in excess of his ratable share of the undistributed earnings and profits of the corporation accumulated after February 28, 1913. The remainder, if any, of the gain recognized under paragraph (1) shall be treated as gain from the exchange of property.

It is clear from paragraph (1) of this subsection that any gain realized by Stephan Schaffan on the distribution must be recognized to the extent of the cash received. Furthermore, since Mr. Schaffan was the sole owner of both corporations before and after the distribution, the exchange certainly has the effect of a dividend within the meaning of paragraph (2). See *DeGroff v. Commissioner, supra* at 71. Therefore, the gain recognized by Stephan Schaffan must be treated as a dividend to the extent of the undistributed earnings and profits of "the corporation." The remainder of his gain would be properly treated as gain on the exchange of property.

In *South Texas Rice Warehouse Co. v. Commissioner,* 43 T.C. 540, 570–572 (1965), affd. in part and revd. in part sub nom. *Davant v. Commissioner,* 366 F.2d 874 (5th Cir. 1966), cert. denied 386 U.S. 1022 (1967), we held that boot received in connection with a "D" reorganization was to be treated pursuant

---

[14]Although petitioners stated in brief that part of this sum was received in 1971, rather than 1970, they have presented no evidence that this was the case. Furthermore, they apparently concede the treatment of the sums as received in 1970.

to section 356 and that the earnings and profits against which a dividend is measured under section 356(a)(2) are only the earnings and profits of the transferor corporation in a "D" reorganization. After reversal on this point by the appellate court, we had occasion to reexamine our position in *American Manufacturing Co. v. Commissioner, supra.* There, with a thorough discussion, we reaffirmed our position.[15]

Respondent again urges us to reverse our position on this issue in this case. However, he advances no arguments that were not raised and dismissed in *American Manufacturing Co. v. Commissioner, supra.* Our reexamination of these arguments does not convince us that our position is in error. For the reasons stated at length in *American Manufacturing Co. v. Commissioner, supra* at 224–231, we hold that the distribution received by Stephan Schaffan is to be treated pursuant to section 356 and that his gain is to be treated as a dividend pursuant to section 356(a)(2) only to the extent of the undistributed earnings and profits of Fletcher Plastics, Inc.

## Issue 3. Liability of Atlas for Fletcher's Tax Deficiencies

Petitioners have conceded, for purposes of this action, the tax deficiencies of Fletcher that form the basis of the notice sent to Atlas in docket No. 7634–74, Atlas Tool Co., Inc., successor to Fletcher Plastics, Inc. Therefore, the only issue remaining in that docket is whether Atlas is liable for those deficiencies as determined by respondent.

Section 6901[16] provides a procedure for collection of tax liabilities from a transferee[17] of property from a taxpayer, when the transferee is liable for payment of those liabilities. This

---

[15] See also *Estate of Bell v. Commissioner, supra.*

[16] SEC. 6901. TRANSFERRED ASSETS.

(a) METHOD OF COLLECTION.—The amounts of the following liabilities shall, except as hereinafter in this section provided, be assessed, paid, and collected in the same manner and subject to the same provisions and limitations as in the case of the taxes with respect to which the liabilities were incurred:

(1) INCOME, ESTATE, AND GIFT TAXES.—

(A) TRANSFEREES.—The liability, at law or in equity, of a transferee of property—

(i) of a taxpayer in the case of a tax imposed by subtitle A (relating to income taxes), * * *

[17] Sec. 301.6901–1, Income Tax Regs., provides in part:

Sec. 301.6901–1. Procedure in the case of transferred assets.

(b) *Definition of transferee.* As used in this section, the term "transferee" includes * * * the shareholder of a dissolved corporation, * * * the successor of a corporation, a party to a reorganization as defined in section 368, and all other classes of distributees. * * *

section is merely procedural, however, and does not create any basis for liability. The existence and extent of a transferee's liability for the transferor's unpaid taxes are determined by State law. *Commissioner v. Stern*, 357 U.S. 39, 45 (1958). On brief, respondent expressly abandoned any claim that Atlas is liable in equity for the tax liabilities of Fletcher and relied on its assertion that Atlas is liable at law.[18]

As a general rule, a corporation that purchases all of the assets of another corporation is not liable for the debts and liabilities of the transferor. *Knapp v. North American Rockwell Corp.*, 506 F.2d 361, 364 (3d Cir. 1974); W. Fletcher, Cyclopedia of the Law of Private Corporations, sec. 7122 (perm. ed. 1973). The courts of New Jersey recognize this rule and have expounded certain exceptions to it. In *McKee v. Harris-Seybold Co.*, 109 N.J. Super. 555, 264 A.2d 98, 101–102 (Super. Ct. Law Div. 1970), affd. per curiam 118 N.J. Super. 480, 288 A.2d 585 (Super. Ct. App. Div. 1972), the rule and its exceptions were stated in the following manner:

It is the general rule that where one company sells or otherwise transfers all its assets to another company the latter is not liable for the debts and liabilities of the transferor, including those arising out of the latter's tortious conduct, except where: (1) the purchaser expressly or impliedly agrees to assume such debts; (2) the transaction amounts to a consolidation or merger of the seller and purchaser; (3) the purchasing corporation is merely a continuation of the selling corporation; or (4) the transaction is entered into fraudulently in order

---

[18]Respondent also pursued on brief assertions that Atlas is "primarily" liable for Fletcher's tax liabilities, rather than liable as a transferee, in docket No. 7634–74. However, if the notice mailed to Atlas in that docket were a notice of deficiency mailed to it as taxpayer rather than as transferee, the notice would not support our jurisdiction over the tax liabilities there asserted. The notice would have been invalid either as a determination with respect to improper taxable years, see *Schick v. Commissioner*, 45 T.C. 368 (1966); *Atlas Oil & Refining Corp. v. Commissioner*, 17 T.C. 733 (1951); *Reef Corp. v. Commissioner*, 368 F.2d 125 (5th Cir. 1966), affg. in part and revg. in part a Memorandum Opinion of this Court, or as a second notice to Atlas for the same taxable year barred by sec. 6212(c), see *Harvey Coal Corp. v. Commissioner*, 12 T.C. 596 (1949). In addition, respondent's theory is predicated on the applicability of N. J. Stat. Ann. sec. 14A:10–6(e) (West 1969), dealing with the effects of a statutory merger or consolidation. See *Oswego Falls Corp. v. Commissioner*, 26 B.T.A. 60 (1932), affd. 71 F.2d 673 (2d Cir. 1934). But see *Marion-Reserve Power Co. v. Commissioner*, 1 T.C. 513 (1943). It is clear on this record that the requirements of New Jersey law for statutory merger or consolidation were not satisfied here. Some confusion exists in certain cases involving statutory mergers or consolidations as to whether liability of Atlas of the transferee for taxes of the transferor is a primary or transferee liability. However, the cases are clear that absent a statutory merger or consolidation, where one corporation acquires the assets of another under the circumstances of the instant case any liability of the successor corporation for the unpaid taxes of the dissolved corporation is as a transferee and not as the taxpayer itself. See *California Iron Yards Corp. v. Commissioner*, 82 F.2d 776 (9th Cir. 1936), cert. denied 299 U.S. 553 (1937), affg. a Memorandum Opinion of this Court. Cf. *New Colonial Ice Co. v. Helvering*, 292 U.S. 435 (1934); *Carnation Milk Products Co. v. Commissioner*, 20 B.T.A. 627 (1930).

to escape liability for such debts. * * * A fifth exception, sometimes incorporated as an element of one of the above exceptions, is the absence of adequate consideration for the sale or transfer. * * * [Citation omitted.]

See also *Wilson v. Fare Well Corp.*, 140 N.J. Super. 476, 356 A.2d 458, 463 (Super. Ct. Law Div. 1976).

In our view, it is clear on this record that exceptions one, four, and five, so stated, have no application in this case. Fletcher remained in existence until it satisfied its own known liabilities. The transfer documents for the assets acquired by Atlas, which apparently were never executed, contained no assumption of liabilities by Atlas. The steps taken by Fletcher were taken solely for valid business reasons, not for any fraudulent purpose. Finally, the cash payment for the assets of Fletcher in an amount determined by unrelated appraisers was adequate consideration.

The exceptions for mere continuation of the transferor and for transactions amounting to mergers or consolidations under New Jersey law have been the subject of litigation in several cases.

Merger and consolidation were described generally as follows in *Applestein v. United Board & Carton Corp.*, 60 N.J. Super. 333, 159 A.2d 146, 151 (Super. Ct. Ch. Div. 1960), affd. per curiam 33 N.J. 72, 161 A.2d 474 (1960):

A merger of corporations is the absorption by one corporation of one or more usually smaller corporations, which lose their identity by becoming part of the large enterprise. * * * A merger of two corporations contemplates that one will be absorbed by the other and go out of existence, but the absorbing corporation will remain. In a consolidation, the two corporations unite and both go out of existence, and a new amalgamated corporate enterprise takes the place of the former corporations.

Furthermore, when the substance of a particular combination is that of a merger or consolidation, the New Jersey courts have applied a doctrine of de facto merger to give that combination some of the legal effects of a merger or consolidation. *Applestein v. United Board & Carton Corp.*, *supra* at 155; see *William B. Riker & Son Co. v. United Drug Co.*, 79 N.J. Eq. 580, 82 A. 930 (1912); *Good v. Lackawanna Leather Co.*, 96 N.J. Super. 439, 233 A.2d 201 (Super. Ct. Ch. Div. 1967). The court in *Applestein v. United Board & Carton Corp.*, 159 A.2d at 154, listed the following factors it considered in determining that a corporate combination was a de facto merger:

(1) a transfer of all the shares and all the assets of Interstate to United; (2) an assumption by United of Interstate's liabilities; (3) a "pooling of interests" of the two corporations; (4) the absorption of Interstate by United, and the dissolution of Interstate; (5) a joinder of officers and directors from both corporations on an enlarged board of directors; (6) the present executive and operating personnel of Interstate will be retained in the employ of United; and (7) the shareholders of the absorbed corporation, Interstate, as represented by the sole stockholder, Epstein, will surrender his 1,250 shares in Interstate for 160,000 newly issued shares in United, the amalgamated enterprise.

The Court noted, however, that each case must be judged on its own peculiar facts to determine if there is the substance of a merger. Subsequent cases have noted that all the factors listed in *Applestein v. United Board & Carton Corp.*, *supra*, are not necessary for a de facto merger, and several of the factors have been emphasized in reaching varying conclusions.

Most of the cases dealing with de facto mergers have arisen in the contexts of products liability suits or shareholder actions against their corporation. Three cases are illustrative of those finding de facto mergers. In *Applestein v. United Board & Carton Corp.*, *supra*, the sole stockholder of the transferor corporation contracted with the transferee to exchange his stock in the transferor for a 40-percent stock interest in the transferee, after which it was planned to liquidate the transferor and operate its assets and business in the transferee corporate entity. The transferor's stockholder was to become the president of the transferee and control its board of directors. Considering all of the elements of the transaction, the court held that there was more than a mere purchase of stock; there was a de facto merger and, therefore, the transferee's shareholders were entitled to appraisal rights. *Wilson v. Fare Well Corp.*, *supra*, involved two transactions. In both, there was a transfer of substantially all assets and retention of employees. The consideration for one transaction was approximately half stock and half cash, with a corresponding continuity of shareholder interest, and the transferee assumed most of the transferor's known liabilities. This transaction was held to be a de facto merger. However, in the other transaction the court held there could be no merger because there was "no stock transfer, a different location was used to manufacture the same product and certain personnel was changed." Finally, in *Shannon v. Samuel Langston Co.*, 379 F. Supp. 797 (W.D. Mich. 1974), the District Court found a de facto merger, applying New Jersey

law, when all the "operating assets" were acquired solely for stock of the transferee, the operating personnel and operations were continued with the transferee in the same location, the transferee assumed all debts and obligations necessary for continuation of the transferor's operations, and the transferor dissolved in due course after distribution of the consideration paid. In explaining its reliance on the fact that stock was the consideration for the transfer and by way of distinguishing cases finding no de facto merger, the court explained that in a case where there was only a cash transfer the stockholders of the transferor "never became a part of the purchasing corporation."

As noted in *Shannon v. Samuel Langston Co.*, *supra*, the cases finding no de facto merger are characterized by a lack of continuity of shareholders between the transferor and transferee corporations resulting from acquisition for cash only and by a concomitant difference in corporate directors and officers. Other characteristics such as assumption of liabilities, termination of the transferor's existence, and retention of key employees are not so commonly held and do not offer so sharp a contrast with the cases finding de facto mergers on their facts. See *Menacho v. Adamson United Co.*, 420 F. Supp. 128 (D. N.J. 1976); *McKee v. Harris-Seybold Co.*, *supra; Good v. Lackawanna Leather Co.*, *supra*.

The cases involving the exception for mere continuation of the transferor have examined most of the same factors that are discussed with respect to de facto mergers. It is apparent that the various factors are considered together in a manner similar to de facto merger cases in deciding the applicability of the exception.

In *Jackson v. Diamond T. Trucking Co.*, 100 N.J. Super. 186, 241 A.2d 471, 477 (Super. Ct. Law Div. 1968), the factors considered in finding a continuation were:

(1) transfer of corporate assets (2) for less than adequate consideration (3) to another corporation which continued the business operation of the transferor (4) when both corporations had at least one common officer or director who was in fact instrumental in the transfer * * * and (5) the transfer rendered the transferor incapable of paying its creditors' claims because it was dissolved in either fact or law.

*McKee v. Harris-Seybold Co.*, *supra*, found no continuation where the management, stockholders, and directors did not remain with the transferee. In *Wilson v. Fare Well Corp.*, *supra*,

a continuation was found even though there was no continuity of shareholders. This seemingly inconsistent position may be explained by the fact that the parties to the transaction had intended for the transferee "to assume all the benefits and burdens of its predecessor in the continuation of the business" and had publicized their intent. Furthermore, the court was heavily influenced by policy considerations related to product liability. See *Menacho v. Adamson United Co., supra* at 135–138. We also note that adequacy of consideration was not considered an additional bar to continuation in *McKee v. Harris-Seybold Co., supra,* or a problem in finding continuation in *Wilson v. Fare Well Corp., supra.* Inadequacy of consideration is suggested as a separate exception to the general rule of no liability in the New Jersey cases. If it were to be an element of continuation, the latter exception would be rendered superfluous. In our view, inadequacy of consideration is not a proper element of the continuation exception. Cf. *Shannon v. Samuel Langston Co., supra* at 801 n. 1.

Under the cases discussed, the applicability of the de facto merger and continuation exceptions in this case must ultimately turn on an evaluation of the individual characteristics and the substance of the transactions involving Atlas, Fletcher, and Stephan Schaffan. Initially, we note that all operating assets and inventory of Fletcher were transferred to Atlas. These were all the assets necessary for the continuation of Fletcher's business operations by Atlas. Also, all of Fletcher's employees continued their employment with Atlas. The shareholders, directors, and officers of Atlas were identical to those of Fletcher. Fletcher ceased business activity after the transfer, and its corporate existence was terminated as promptly thereafter as possible. All of these factors weigh heavily toward finding both a de facto merger and a continuation of the transferor in this case.

Although the consideration for the transfer was solely cash and not stock of Atlas, the nature of the consideration is relevant primarily as an indication of shareholder continuity. See *Lopata v. Bemis Co.,* 406 F. Supp. 521, 526 (E.D. Pa. 1975); *Shannon v. Samuel Langston Co., supra* at 801. Complete shareholder continuity is provided in this case independently of the consideration paid. Otherwise, the nature of the consideration would appear to be of little importance in determining the

question of liability. Creditors of the transferor are not significantly affected by the nature of the consideration but are more interested in the value of the consideration and the continued existence of the debtor.

Atlas neither expressly nor impliedly assumed any liabilities of Fletcher, but we view this common characteristic of mergers as inconsequential under the circumstances. Fletcher had no long-term liabilities. Its current liabilities were dwarfed by its accounts receivable and cash on hand, neither of which were transferred to Atlas. Thus, there would appear to be no then known liabilities of Fletcher that Atlas would have needed to assume for the orderly continuation of Fletcher's business. See *Shannon v. Samuel Langston Co., supra* at 801 n. 1.

Finally, in all cases finding a de facto merger or continuation under New Jersey law, and even in most of the other cases in which the issues were raised, the business activities of the transferor were carried on by the transferee. This is a fact in the instant case, as well. Here, Atlas retained Fletcher's operating assets intact at the same location. Their partial use was begun within 3 months, and full use was achieved in less than a year. While the intended interruption of activity is a relevant consideration in determining the existence of a reorganization under Federal tax law since it may circumscribe the plan of reorganization, the interruption is not of intrinsic importance to the questions of de facto merger or continuation under State law. In our view, resumption of the transferor's business coupled with the retention of the assets by the corporation for that specific purpose should the need arise would be considered sufficient under New Jersey law to support liability of the successor corporation, and we so hold.

Our discussion of each of these characteristics shows the strong correspondence between the facts of this case and de facto mergers and continuations under New Jersey law. Viewed functionally, no element is missing. Furthermore, the transaction taken as a whole has the substance of a merger or continuation as described in the cases discussed. We find under New Jersey law that the transaction between Atlas and Fletcher was a de facto merger and that Atlas was the continuation of Fletcher for purposes of imposing on Atlas the liabilities of Fletcher. Therefore, the tax liability asserted in docket No.

7634–74 is properly imposed on Atlas as a transferee at law of Fletcher.

## Issue 4. Accumulated Earnings Tax

In its fiscal years ending June 30, 1969, and June 30, 1970, Atlas produced earnings and profits considerably in excess of the amounts distributed to its shareholder. It also consistently experienced substantial profits in the years prior to those in issue. A very large portion of its assets were cash or similar liquid assets. The record shows that Atlas had net liquid assets, the excess of current assets over current liabilities, of $2,195,840.33 and $2,470,804.76, respectively, at the end of the 2 years in issue.

Respondent determined that Atlas was liable for accumulated earnings taxes for its 1969 and 1970 fiscal years. The accumulated earnings tax is imposed by section 531[19] on corporations which, under section 532,[20] are formed or availed of for the purpose of avoiding the income tax with respect to their shareholders by permitting earnings and profits to accumulate rather than being divided or distributed to their shareholders. Section 533[21] provides that the fact that earnings and profits are permitted to accumulate "beyond the reasonable needs of the business" shall be determinative of the purpose to avoid the income tax, unless the corporation proves to the contrary. The "reasonable needs of the business" include the "reasonably anticipated" needs of the business. Sec. 537.[22]

---

[19]SEC. 531. IMPOSITION OF ACCUMULATED EARNINGS TAX.

In addition to other taxes imposed by this chapter, there is hereby imposed for each taxable year on the accumulated taxable income (as defined in section 535) of every corporation described in section 532, an accumulated earnings tax equal to the sum of—

    (1) 27½ percent of the accumulated taxable income not in excess of $100,000 plus

    (2) 38½ percent of the accumulated taxable income in excess of $100,000.

[20]SEC. 532. CORPORATIONS SUBJECT TO ACCUMULATED EARNINGS TAX.

    (a) GENERAL RULE.—The accumulated earnings tax imposed by section 531 shall apply to every corporation (other than those described in subsection (b)) formed or availed of for the purpose of avoiding the income tax with respect to its shareholders or the shareholders of any other corporation, by permitting earnings and profits to accumulate instead of being divided or distributed.

[21]SEC. 533. EVIDENCE OF PURPOSE TO AVOID INCOME TAX. ·

    (a) UNREASONABLE ACCUMULATION DETERMINATIVE OF PURPOSE.—For purposes of section 532, the fact that the earnings and profits of a corporation are permitted to accumulate beyond the reasonable needs of the business shall.be determinative of the purpose to avoid the income tax with respect to shareholders, unless the corporation by the preponderance of the evidence shall prove to the contrary.

[22]SEC. 537. REASONABLE NEEDS OF THE BUSINESS. ·

For purposes of this part, the term "reasonable needs of the business" includes the reasonably anticipated needs of the business.

Petitioners have advanced ordinary and extraordinary working capital needs as one basis for their accumulation of earnings and profits. See sec. 1.537–2(b)(4), Income Tax Regs. The parties each submitted a so-called "Bardahl" computation[23] as evidence of Atlas' normal working capital needs and then joined issue over the treatment of Atlas' letters of credit as an extraordinary working capital need. Respondent gave no effect to the existence or payment of the letters of credit. Petitioners' computation assumed that the typical amount of letters of credit outstanding at a given time were an additional, extraordinary working capital need. Although the figure used for typical outstanding letters of credit was in line with the testimony before the Court, petitioners subsequently have argued that a larger amount, totaling all letters issued during the year, should be considered an extraordinary working capital need.

In our view, in addition to certain errors in computation, both parties have misunderstood the nature of the letters of credit and their relationship to Atlas' working capital needs. Letters of credit were merely the means by which Atlas financed most of its imported inventory. This inventory was ordered, received, and held for sale by Atlas just like domestically manufactured inventory. However, the means of payment for the imports differed in two ways. First and most importantly, cash payment had to be made for the imports, pursuant to the letters of credit, 2 to 3 weeks before receipt of the inventory from the carrier. In its domestic purchases, Atlas was simply billed upon shipment and paid for the inventory after its receipt. Second, both Atlas and the bank that issued the letter of credit were in the position of guaranteeing payment of the letter during the period from issuance of the letter to its payment. During the years in issue, Atlas' line of credit with its bank was in excess of the usual amount of letters of credit outstanding, and the record does not show that the bank ever required Atlas to deposit any sum for payment of the letters until payment was due. It appears that the bank was willing to issue the letters simply on the general credit of the corporation. Atlas itself was in no different position with respect to its cash needs than if it had ordered the merchandise by ordinary contract and had agreed to pay for it 2

---

[23]See *Bardahl Manufacturing Corp. v. Commissioner,* T.C. Memo. 1965–200. See generally *Ready Paving & Construction Co. v. Commissioner,* 61 T.C. 826 (1974); *Magic Mart v. Commissioner,* 51 T.C. 775 (1969).

to 3 weeks before delivery. Thus, the letters of credit did not represent any extraordinary working capital need, but instead were simply a component of its normal working capital needs.

With this view of the letters of credit, we may proceed to evaluate Atlas' working capital needs. Both petitioners and respondent computed these needs on the basis of one operating cycle, and we have found no convincing evidence that working capital in excess of one operating cycle was required. Also, the parties included in Atlas' operating cycle a period of time necessary to convert inventory into sales and accounts receivable and a period necessary to collect the accounts receivable. Respondent subtracted from the sum of these periods the time extended to Atlas to pay for its inventory, but petitioners did not. Ordinarily, respondent's action would properly reflect the fact that credit extended to Atlas would reduce the period of time its cash was tied up in its inventories and accounts receivable. In this case, however, approximately half of Atlas' inventory was purchased with letters of credit and this had an effect that was the reverse of extending credit. Atlas had to pay for this inventory before receipt not after. The effect of the use of letters of credit was thus to increase the length of Atlas' operating cycle with respect to approximately half of its purchases, while the credit extended on the other half, its domestic purchases, decreased the cycle. In our view, since the respective increases and decreases were of approximately the same length of time, no net adjustment to the operating cycle is appropriate in this case to reflect Atlas' financing arrangements with its suppliers.

In computing for the fiscal year ending June 30, 1969, the length of the operating cycle period between receipt and sale of inventory, or the inventory turnover period, both respondent and petitioners divided the average outstanding inventory by the total inventory sold for the year, obtaining average inventory turnover periods of 1.15 and 1.25[24] months, respectively. However, Atlas had a seasonal sales pattern. The record indicates that Atlas stockpiled inventory in the months preceding the end of the fiscal year and that it experienced peaks in its inventory 2 or 3 months after the end of each fiscal year.

---

[24]Petitioners' figure of 1.25 months was based on the use of an erroneous figure for Atlas' cost of goods sold, rather than the amount shown on Atlas' tax return.

Therefore, in our view, the average turnover periods suggested by the parties are too short to reflect the working capital needs of Atlas as of the end of the year. Based on a more realistic view of Atlas' inventory flow, we find that Atlas' inventory turnover period on June 30, 1969, could be expected to be 2 months.

The record indicates that, although Atlas' inventory turnover varied seasonally, Atlas did not experience any significant seasonal variation in collection of its accounts receivable. Therefore, an average turnover period for its accounts receivable adequately serves to establish its operating cycle. Our computation of this period is 1.33 months.

The two periods we have found to be proper components of Atlas' operating cycle represent 27.75 percent of a year. Atlas' working capital needs can be said to be approximated by applying that percentage to the sum of the yearly operating expenses for which a cash outlay is required and yearly cost of goods sold. These items, taken from Atlas' return, total $4,788,907.43. From these figures we compute Atlas' approximate working capital needs as of the end of its 1969 fiscal year to be $1,328,921.72. In our view, the entire record supports the use of this figure as a reasonable approximation of working capital needs, and therefore we find that Atlas had working capital needs as of June 30, 1969, of $1,328,921.72.

Respondent submitted a "Bardahl" computation for Atlas' 1970 fiscal year, but petitioners did not. Respondent's computation is based on data taken from the balance sheets included in Atlas' tax return for that year. Our examination of these balance sheets causes us to discount heavily respondent's computation. The balance sheets show only data at the beginning and end of the fiscal year. The beginning data, carried forward from the 1969 return, is in line with similar data for other years and appears to reflect Atlas' normal operations. However, the data for June 30, 1970, radically differs from that of other years and from Atlas' normal operations to a degree that indicates a distortion peculiar to that particular date. In our view, a "Bardahl" computation based on these figures would yield only a distorted estimate of Atlas' true working capital needs.

We have examined the financial data available to us, and we have determined that Atlas' operations in 1970 differed only slightly from those of 1969 in terms of working capital needs.

For instance, the sum of its cost of goods sold for the year and its yearly operating expenses for which a cash outlay was required was $4,781,537.24, only $7,370.19 less than in 1969. Because Atlas' working capital needs on June 30, 1970, did not differ significantly from its needs at the end of the previous fiscal year, we find that its working capital needs on June 30, 1970, were $1,328,921.72.

We have found that the funds needed for payment of Atlas' letters of credit were not an extraordinary working capital need, as argued by petitioners, but are adequately reflected in the amount we have found to be its normal working capital needs. Therefore, the letters of credit do not represent any additional need for accumulation of Atlas' earnings and profits. The only other basis petitioners advance for this accumulation is proposed expansion and modernization of Atlas' physical facilities. See sec. 1.537–2(b)(1), Income Tax Regs.

The record shows that Atlas had a history of physical expansion. Buildings were acquired, constructed, or expanded in 1948, 1950, 1951, 1952, 1959, 1961, 1964, and 1968. Property was acquired for an additional building in 1972, and that building was completed in 1975. Petitioners contend that accumulations were necessary in its fiscal years ending June 30, 1969, and June 30, 1970, for the expansion that ultimately was evidenced by this last building.

The future needs of a business may justify a current accumulation of earnings and profits in appropriate circumstances. Section 1.537–1(b), Income Tax Regs., provides:

(b) *Reasonably anticipated needs.* (1) In order for a corporation to justify an accumulation of earnings and profits for reasonably anticipated future needs, there must be an indication that the future needs of the business require such accumulation, and the corporation must have specific, definite, and feasible plans for the use of such accumulation. Such an accumulation need not be used immediately, nor must the plans for its use be consummated within a short period after the close of the taxable year, provided that such accumulation will be used within a reasonable time depending upon all the facts and circumstances relating to the future needs of the business. Where the future needs of the business are uncertain or vague, where the plans for the future use of an accumulation are not specific, definite, and feasible, or where the execution of such a plan is postponed indefinitely, an accumulation cannot be justified on the grounds of reasonably anticipated needs of the business.

(2) Consideration shall be given to reasonably anticipated needs as they exist on the basis of the facts at the close of the taxable year. Thus, subsequent events shall not be used for the purpose of showing that the retention of

earnings or profits was unreasonable at the close of the taxable year if all the elements of reasonable anticipation are present at the close of such taxable year. However, subsequent events may be considered to determine whether the taxpayer actually intended to consummate or has actually consummated the plans for which the earnings and profits were accumulated. In this connection, projected expansion or investment plans shall be reviewed in the light of the facts during each year and as they exist as of the close of the taxable year. If a corporation has justified an accumulation for future needs by plans never consummated, the amount of such an accumulation shall be taken into account in determining the reasonableness of subsequent accumulations.

See also *Faber Cement Block Co. v. Commissioner*, 50 T.C. 317, 331 (1968).

Atlas suffered a lack of adequate space frequently. At various times it rented space for storage purposes. However, it completed a major expansion in 1968, and the evidence shows that a need for additional space was not apparent for a period in excess of 1 year. Atlas' 1969 fiscal year ended on June 30. In our view, Atlas had formed no specific, definite, and feasible plan for expansion by June 30, 1969. If anything, it had only the initial realization that expansion might be required at some indefinite time in the future. Property for the expansion was not acquired until 1972, and active planning did not begin until 1973. We find that Atlas had no reasonably anticipated need of funds for expansion on June 30, 1969.

During its 1970 fiscal year, however, we believe the need for space was of sufficient intensity to spur more concrete plans for expansion. Obviously, the tangible steps taken in the following years were not taken without considerable thought and planning. The record indicates that during 1970 specific, definite, and feasible plans were made to expand Atlas' facilities. Therefore, we find that on June 30, 1970, Atlas had a reasonably anticipated need of funds for an expansion of its physical plant.

The amount of Atlas' need for expansion capital was certainly not the amount finally paid for the building constructed in 1975, however. Only funds for the "reasonably anticipated" needs of the business may be accumulated. The evidence shows that during the planning stages the anticipated cost of Atlas' fifth building, including the equipment it was to contain, was only $300,000. The land acquired for the building in 1972 cost only $39,000. On this record, we find that Atlas had a reasonably anticipated need of no more than $339,000 for expansion of its facilities on June 30, 1970.

Having found reasonable needs in Atlas' business for $1,328,921.72 on June 30, 1969, and $1,667,921.72 on June 30, 1970, it is readily ascertainable that any accumulations of earnings and profits made during either of Atlas' fiscal years ending on these dates were beyond the reasonable needs of its business. In determining whether Atlas' accumulations violated this standard, it is necessary to determine whether prior accumulations were sufficient to meet its needs in the current years. *Bremerton Sun Publishing Co. v. Commissioner*, 44 T.C. 566, 582–583 (1965); sec. 1.535–3(b)(1)(ii), Income Tax Regs. In the instant case, the record shows that Atlas' accumulated earnings and profits on June 30, 1968, the beginning of the 2 years in issue, were in excess of $1,812,733.70. Of course, the mere size of the prior accumulation alone does not establish that it was sufficient for the needs of the business. The nature of the accumulation must be considered. *Bremerton Sun Publishing Co. v. Commissioner, supra.* But here the bulk of the accumulation was reflected in liquid assets. Net liquid assets on June 30, 1968, were $1,721,905.97. Furthermore, net liquid assets increased substantially during the year, totaling $2,195,840.33 on June 30, 1969. In our view, the earnings and profits accumulated in prior years and reflected on June 30, 1968, and throughout the 1969 fiscal year in liquid assets were far beyond the reasonable needs of Atlas' business during its 1969 fiscal year. Therefore, we find that any additional accumulation made during that year was beyond the reasonable needs of Atlas' business.

A corresponding analysis shows that at the beginning of Atlas' 1970 fiscal year it had accumulated earnings and profits of at least $2,181,196.70 and net liquid assets of $2,195,840.33. Net liquid assets grew to $2,470,804.76 during the fiscal year. Thus, its accumulated earnings and profits reflected in liquid assets far exceeded the amount of those assets we have found to be reasonable needs of the business, $1,667,921.72. We find that any amount of earnings and profits accumulated during Atlas' 1970 fiscal year was beyond the reasonable needs of its business.

Since any earnings and profits not distributed to Atlas' shareholder during its 1969 and 1970 fiscal years were accumulated beyond the reasonable needs of its business, section 533 dictates the imposition of the accumulated earnings tax unless Atlas has proved by a preponderance of the evidence that it was not formed or availed of for the purpose of avoiding the income

tax with respect to its shareholder by means of the accumulation. The record shows that Stephan Schaffan was taxed on his marginal income at the highest income tax rates. Atlas was taxed at lower corporate rates. Although Stephan Schaffan's salary of $75,000 might be considered adequate, it was not generous considering that he was the moving force behind a growing and profitable business. Atlas listed no loans to its shareholder during the years in issue, but on these facts this only indicates that Stephan Schaffan had no use for the additional funds at the time. Furthermore, although Atlas paid dividends in the years in issue, the amounts were small compared to the company's profits and considering that it had no need for a large part of its liquid funds. On this record, we find that Atlas has failed to prove that it was not availed of for the purpose of avoiding the income tax with respect to its shareholder by permitting its earnings and profits to accumulate. Therefore, Atlas is subject to imposition of the accumulated earnings tax for its fiscal years ending June 30, 1969, and June 30, 1970, as determined by respondent.

*Decisions will be entered under Rule 155.*